Brett L. BAYLES, Michael P. Frey, Jeralyn Johansen, Steven J. Nelson, Jeffrey S. Turner, James Reynolds, Steve Dunn, on behalf of themselves and others similarly situated, Plaintiffs,

v.

AMERICAN MEDICAL RESPONSE OF COLORADO, INC., a Delaware corporation, Defendant.

Civil Action No. 94–B–2300.

United States District Court, D. Colorado.

Dec. 31, 1996.

Donna Dell'Olio, Cornish and Dell'Olio, Colorado Springs, CO, for Plaintiffs.

John R. Webb, Holme Roberts & Owen L.L.P., Denver, CO, for Defendant.

## MEMORANDUM OPINION & ORDER

BABCOCK, District Judge.

Plaintiffs move for reconsideration of my September 4, 1996, summary judgment order, *Bayles v. American Medical Response,* 937 F.Supp. 1477 (D.Colo.1996). Defendant renews its motion to decertify plaintiffs' class under 29 U.S.C. § 216(b) or, in the alternative, for subclasses and separate liability ver-dicts. For the following reasons I will grant in part and deny in part each motion.

### I.

Reed Ambulance, Inc., predecessor of defendant, American Medical Response of Colorado, Inc. (AMR), operated an ambulance service until it merged with Ambulance Service Company in September of 1993. In October 1993, Ambulance Service Company changed its name to American Medical Response of Colorado, Inc. Reed and AMR will be referred to collectively as AMR. Before August 1, 1993, AMR scheduled its ambulance crews to work approximately ten, twenty-four hour shifts per month. Before August 1, 1992, AMR deducted three hours per shift for meals. After August 1, 1992, it deducted two hours per shift. If an employee was unable to enjoy a meal break during the designated meal period, the employee could submit an extra time slip requesting compensation. Management would then review the call out records to determine whether the employee had sufficient time between calls to enjoy a meal.

AMR also deducted eight hours from each twenty-four hour shift for sleeptime. If ambulance crews were called to duty during this time, they were paid for time worked rounded to the nearest half-hour as long as time worked exceeded fifteen minutes. When calls to duty amounted to more than 3½ hours, employees were paid for all eight hours. Thus, on average plaintiffs were paid for either thirteen or fourteen hours of work per twenty-four hour shift.

Each plaintiff was employed by AMR in at least one of five positions: ambulance driver, ambulance attendant, cabulance driver, cabulance attendant, or dispatcher. Plaintiffs contend that AMR's failure to pay overtime compensation and its deduction of mealtime and sleeptime from hours worked violated the Fair Labor Standards Act, 29 U.S.C. §§ 201–19.

## II. PLAINTIFFS' REQUEST FOR RECONSIDERATION

Plaintiffs request reconsideration of my memorandum opinion and order of September 4, 1996. *Bayles v. American Medical*

*Response,* 937 F.Supp. 1477 (D.Colo.1996). In particular, plaintiffs contend that I erred in granting summary judgment on (1) plaintiffs' claim for mealtime compensation and (2) the statute of limitations for overtime claims because genuine issues of material fact allegedly remain to be decided. Because I find that genuine issues of fact exist with regard to plaintiffs' mealtime claims, I will vacate my order of summary judgment on those claims. I will deny plaintiffs' motion to reconsider in all other respects.

Reconsideration may be granted upon "an intervening change in the controlling law, the availability of new evidence, or the need to correct clear error or prevent manifest injustice." *Brumark Corp. v. Samson Resources Corp.,* 57 F.3d 941, 948 (10th Cir.1995). Plaintiffs do not contend there has been a change in the controlling law or that new evidence has been uncovered. Accordingly, I will only reconsider my September 4, 1996, order for clear error.

### A. *Mealtime Compensation*

Plaintiffs argue that I clearly erred in granting summary judgment on their claims for mealtime compensation because genuine issues of material fact remain to be decided regarding whether (1) plaintiffs received less than forty-five minutes of uninterrupted mealtime, and (2) plaintiffs' mealtime was spent predominantly for the benefit of the employer. I agree that there remain genuine issues of material fact regarding the plaintiffs' first contention, but not the second, and I will, therefore, vacate my earlier grant of summary judgment on plaintiffs' mealtime compensation claims.

#### 1. The Forty–Five–Minute Meal Break

█ In my September 4, 1996, order, I found that it was undisputed that plaintiffs were permitted to submit additional pay slips to AMR for mealtimes if the plaintiffs did not have at least a forty-five-minute, uninterrupted period in which they could have eaten. AMR considered forty-five minutes to equal one hour for rounding off purposes. AMR's stated policy was to deduct for mealtimes only if the employee had an uninterrupted forty-five minutes during a particular meal period in which to eat. Reed Policy Manual, p. 19. Plaintiffs request that I reconsider and reverse my grant of summary judgment to AMR because there is a genuine question of fact regarding whether AMR followed its stated policy of allowing forty-five minutes for meals. I agree.

The deposition testimony of Sharon Dole is exemplary. Dole testified in a deposition taken in an earlier action against AMR that employees were not paid for mealtimes if they had even a thirty minute uninterrupted period in which they could have eaten. Dole Dep. pp. 26–27, filed Oct. 2, 1995. This contradicts both AMR's stated policy and Dole's later deposition testimony in which she stated that the minimum mealtime was forty-five minutes. Dole Dep. pp. 20–25, filed Aug. 24, 1995. In addition, several affidavits state that at least for some supervisors, the operative inquiry was whether the employee actually managed to eat, regardless of the time to do so. Baalman Aff. ¶ 7(c); Reynolds Aff. ¶ 8(c), both filed June 7, 1995 ("If we turned in an overtime slip for a missed meal, some supervisors would ask, 'Did you eat?' If you ate, your request was denied.").

Looking at this evidence in a light most favorable to the plaintiffs, I cannot conclude as a matter of law that AMR complied with the FLSA regarding mealtime compensation. AMR deducted up to three hours of mealtime per shift from the plaintiffs' pay. If plaintiffs only received thirty minutes or "enough time to eat" for each meal period, AMR's deductions were excessive and plaintiffs are entitled to compensation. If, however, plaintiffs cannot show that AMR departed from its stated policy of allowing at least forty-five minutes for a meal, I adhere to my earlier order and hold as a matter of law that plaintiffs' claim for mealtime compensation must fail.

#### 2. Predominant Benefit Test

█ The plaintiffs also challenge my finding that "no reasonable juror could find that plaintiffs' mealtime was spent predominantly for the benefit of AMR." Plaintiffs allege that my finding was unsupported by sworn

testimony and that I disregarded Brett Bayles' second affidavit. I disagree.

AMR submitted an affidavit by Pat Conroy stating that for each of the three five-hour "time zones" during which an employee could take a meal break, the employees had approximately four hours during which they could take a meal break. Conroy Aff., submitted with AMR's opposition brief, at ¶ 5. Conroy did not consider "coverage calls" and, thus, AMR submitted another affidavit by Stephen Duree demonstrating that Conroy's calculations underestimated plaintiffs calls by 25%. Duree Aff., submitted with AMR's reply on October 31, 1995, at ¶ 5. Even with twenty-five percent more calls, however, plaintiffs would have had more than three and one-half hours during each meal time zone during which to enjoy a meal.

Because plaintiffs had ample time to take a meal break between calls the majority of days, the pertinent issue is how they spent their time during their meal breaks. Plaintiffs never identified evidence showing that they had any duties during mealtime beyond being on call and staying close to their ambulances. As my September 4 order explains, such evidence is simply insufficient as a matter of law to prove that plaintiffs' mealtime was spent primarily for the benefit of AMR.

Bayles' second affidavit, which plaintiffs state I "disregarded," is inapposite. In that affidavit, Bayles lists numerous duties that he was required to fulfill between calls. He does not, however, state that he was unable to take a break from such duties to enjoy a meal. The pertinent inquiry is whether plaintiffs' time *during meals* was spent predominantly for the benefit of AMR. Bayles' affidavit indicates only that his time when not responding to calls was spent generally for the benefit of AMR. Such a broad assertion is insufficient to create a genuine issue of material fact regarding whether plaintiffs' mealtimes were spent predominantly for the benefit of AMR.

The nonmoving party has the burden of showing that there are genuine issues of material fact that preclude summary judgment. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). Plaintiffs bear the burden here as nonmovants to present evidence showing a genuine issue of material fact, and they have failed to do so. Accordingly, I will not disturb my holding of September 4, 1996, that no reasonable juror could find that plaintiffs' mealtimes were spent predominantly for the benefit of AMR.

### B. *Applicability of the Order to Dispatchers and Cabulance Drivers*

Plaintiffs contend that AMR's summary judgment motion did not seek judgment on dispatchers' claims for mealtime compensation. Defendants concede this point and I need not address it further here.

■ Plaintiffs also argue that I inadvertently ruled that a two-year statute of limitations will apply to all plaintiffs' claims for overtime. The statute of limitations for overtime claims varies depending upon a finding of willfulness on the part of defendant in violating the FLSA. Generally, § 207(a)(1) of the FLSA requires that an employee who works more than forty hours per week be compensated at a rate of one and one-half times his regular pay for hours in excess of forty. 29 U.S.C. § 207(a)(1). Defendant presented evidence that it relied upon representations of counsel and administrators indicating that AMR qualified under an exemption to the FLSA requirement for overtime compensation (MCA exemption). Plaintiffs contend that I "apparently overlooked" the fact that the MCA exemption for overtime only applies to certain persons within a "pool of drivers." Because dispatchers are not within a "pool of drivers" under the MCA exemption, plaintiffs argue that questions of material fact remain regarding AMR's willfulness in not paying overtime to dispatchers. I disagree.

Defendant's motion for summary judgment on the appropriate statute of limitations sought judgment against "all plaintiffs (both ambulance crews and dispatchers) based on events outside of the two-year limitations period." Def. Mot. p. 2. I granted defendant's motion as it relates to overtime compensation. Although my order of September 4 does not specifically discuss the statute of limitations as it relates to dispatchers, my

ruling on the statute of limitations for overtime claims applied to all plaintiffs. Defendant presented sufficient evidence such that no reasonable juror could conclude that it acted willfully in denying overtime compensation to all plaintiffs, including dispatchers.

AMR presented evidence establishing that dispatchers may be considered within a pool of drivers even if they did not drive ambulances. *See* Powers' Aff., submitted with defendant's opposition brief on August 24, 1995, at ¶ 7 (detailing safety activities of dispatchers); *Tobin v. Hudson Transit Lines,* 95 F.Supp. 530, 534 (D.N.J.1951) (cited in opposition brief at p. 11) (stating that dispatchers affect the safety of vehicle operation); *Levinson v. Spector Motor Service,* 330 U.S. 649, 673, 67 S.Ct. 931, 943–44, 91 L.Ed. 1158 (1947) (cited at p. 10 of opposition brief) (stating that the D.O.T. has regulatory power "over all employees of such carriers whose activities affect safety of operation. . . ."); 29 CFR § 782.2(a) and (b)(1); *Morris v. McComb,* 332 U.S. 422, 434, 68 S.Ct. 131, 137, 92 L.Ed. 44 (1947) (discussed at pp. 4, 9 and 10 of opposition brief) (stating that D.O.T. has regulatory power over mechanics). AMR also submitted letters from counsel specifically advising it that dispatchers fell within the pool of drivers that qualify for the MCA exemption. *See* "Mangan 1983" and "Mangan 1988," exhibits to opposition brief. Accordingly, I did not clearly err in concluding as a matter of law that AMR did not act willfully in failing to pay overtime compensation to dispatchers.

■ Plaintiffs also state that questions of fact remain with regard to AMR's willfulness in refusing to pay overtime to cabulance drivers because it is disputed whether cabulance drivers made trips to the airport. Allen Powers (Powers), president of Reed from October 1991 to June 1993, indicated that he relied upon the representations of counsel and the Department of Labor (D.O.L.) in refusing to pay overtime to his employees. In my September 4 order, I stated that Reed's (and AMR's) reliance upon such representations precluded a finding of willfulness as a matter of law.

The representations made by the D.O.L. and defendant's counsel indicated that AMR need not pay overtime wages, in part, because its ambulance drivers made trips to the airport that could be considered part of continuing interstate travel. Plaintiffs argue that because it is disputed whether cabulance drivers ever made trips to the airport, a genuine question of fact exists regarding whether AMR willfully violated the FLSA in refusing to pay overtime to cabulance drivers. Plaintiffs' argument fails because plaintiffs have never pointed to any evidence in the record showing that cabulance drivers did not make such trips.

On three separate occasions, plaintiffs alleged in a brief that cabulance drivers never made airport trips. Pltf. Req. for Reconsid. pp. 2–3; Pltf. Opp. to Def. Mot. for SJ on Stat. of Lim. p. 4; Pltf. Rep. to Def. Opp. of SJ p. 10. In each instance, plaintiffs failed to point to any evidence supporting their contention. Plaintiffs cite only to Powers' deposition for the proposition that Powers did not have any support for his contention that cabulance drivers did make airport trips. Pltf. Opp. to Def. Mot. for SJ on Stat. of Lim. p. 4 (citing Powers Dep. pp. 35–36). To the contrary, AMR submitted an affidavit from Powers stating that cabulance drivers did make trips to the airport.

Again, plaintiffs bear the burden here as nonmovants to present and identify evidence showing a genuine issue of material fact, and they have failed to do so. Plaintiffs' counsel cannot create a dispute of fact simply by alleging that one exists in a brief. Accordingly, I will not disturb my holding of September 4, 1996, regarding the applicable statute of limitations for overtime compensation claims.

## III. DEFENDANT'S (RENEWED) MOTION TO DECERTIFY OR, IN THE ALTERNATIVE, FOR SUBCLASSES AND SEPARATE LIABILITY VERDICTS

On February 9, 1995, I conditionally certified this case to proceed as a collective action under 29 U.S.C. § 216(b) (Supp.1996) for the purpose of allowing plaintiffs to send notice to other potential plaintiffs. On October 31, 1995, AMR moved to decertify the case or, in

the alternative, for subclasses and separate liability verdicts. I heard oral argument concerning decertification on December 7, 1995. During that argument, I decided that various issues framed by the parties' pending motions for summary judgment needed to be resolved before I could properly address AMR's decertification motion.

On September 4, 1996, I decided all pending summary judgment motions. *Bayles v. American Medical Response,* 937 F.Supp. 1477 (D.Colo.1996). Accordingly, AMR renewed its motion to decertify based upon my September 4, 1996, order. As discussed, I will modify my order of September 4 as it relates to mealtime compensation claims. Although AMR did not address the mealtime issues in its renewed motion for decertification, it did so in its original decertification motion, which AMR incorporated by reference into its most recent motion. Accordingly, AMR's motion is adequately briefed, and I am sufficiently informed to decide it here. In addition, I heard oral argument on AMR's motion for decertification on December 11, 1996. For the following reasons, I will grant, in part, AMR's motion to decertify.

29 U.S.C. 216(b) permits plaintiffs to proceed under the FLSA "for and in behalf of ... themselves and other employees similarly situated." The statute does not define "similarly situated," nor has the Tenth Circuit explained its meaning. Indeed, the standard to be used in determining whether plaintiffs are sufficiently similarly situated to proceed collectively under § 216(b) has been largely unaddressed by circuit courts. *See Mooney v. Aramco Services Co.,* 54 F.3d 1207, 1213 (5th Cir.1995). District court opinions can generally be divided into four categories. *Id.* In most cases, the gravamen of the debate is the extent to which a collective action under § 216(b) should be treated like a class action under Fed.R.Civ.P. 23.

My survey of the case law has uncovered the following four approaches to defining "similarly situated" under § 216(b): (1) putative class members are similarly situated if they meet the commonality and typicality requirements of modern Rule 23(a); (2) putative class members are similarly situated if they meet all of the requirements of modern Rule 23 that do not "conflict" with the requirements of § 216(b); (3) putative class members are similarly situated if they meet all of the requirements for a "spurious" class under pre–1966 Rule 23; and (4) putative class members meet the requirements for § 216(b) if they are "similarly situated" under the plain meaning of that term and in light of the purposes of a collective action. In my view, the first approach creates too lenient a standard, and I decline to adopt it. For the purposes of this case, the distinctions among the latter three approaches appear to be more theoretical than practical. Given the considerable inconsistencies among the courts, however, it may be helpful to clarify the law for future cases in which such distinctions may make a difference.

Initially, however, I note that AMR conceded at the December 11, 1996, hearing that all plaintiffs who were dispatchers are similarly situated with respect to their mealtime claims, the only claims asserted by them. Therefore, I will permit dispatchers to proceed collectively, regardless of the definition of "similarly situated." Those representative plaintiff(s) who worked as dispatchers, may continue to represent that class with respect to mealtime claims. For the following reasons, however, I will decertify the remainder of the plaintiffs' conditionally certified class.

### A. *Rule 23(a)—Commonality and Typicality*

In *Krueger v. New York Telephone Co.,* 163 F.R.D. 433, 445 (S.D.N.Y.1995), plaintiffs sought to certify both a Rule 23 class action under ERISA and a representative class under the ADEA. The ADEA incorporates § 216(b) of the FLSA by reference. Earlier in the litigation, the court granted authorization to send notice to potential class members. After discovery was completed, the court revisited the question whether the representative plaintiffs were similarly situated to the members of the putative class within the meaning of § 216(b). *Id.* The court first approved the Rule 23 class action. The court then concluded that "[f]or all the reasons that the Court has already found this action should proceed as a class action, and because the representative plaintiffs have satisfied

the commonality and typicality requirements of Rule 23(a)(2) and (a)(3), it is equally true that the named plaintiffs are similarly situated to other members of the ADEA class." *Id.*

*Krueger's* discussion, though brief, implies that "similarly situated" may be defined by the commonality and typicality requirements of Rule 23(a)(2) and (a)(3). To the extent *Krueger* implies that standard, I reject it. Although there is some basis for concluding that Rule 23 and § 216(b) can be read in concert, the elements of Rule 23(a) are *insufficient* to define "similarly situated."

On its face, the *Krueger* standard seems logical. Requiring that plaintiffs have common questions of law or fact at issue and that the representative plaintiff has claims typical of the class appears to reasonably define "similarly situated." Upon further examination, however, Rule 23(a) is not enough. In isolation, the requirements of Rule 23(a) are not all that is needed for a class action to go forward. Rather, to proceed with a class action, representative plaintiffs must also meet one of the alternative requirements of Rule 23(b), which is more stringent. Analogously, the "similarly situated" standard of § 216(b) must require more than compliance with Rule 23(a).

Application of the *Krueger* approach to the facts of this case demonstrates why the minimal requirements of Rule 23(a) are insufficient to show that plaintiffs are similarly situated. AMR, perhaps unwittingly believing that Rule 23(a) presents a higher burden than it does, argues that plaintiffs cannot meet the commonality and typicality requirements of Rule 23(a), and that the class should, therefore, be decertified. I disagree. Common questions of fact are present, and, through the use of subclasses, typical claims could be identified. Therefore, plaintiffs have met the requirements of Rule 23(a), and, if that were the standard, I would not decertify the class. Rule 23(a), however, is not the standard.

Rule 23(a)'s requirements are relatively minimal. Importantly, *Krueger* does not imply that Rule 23(b)(3)'s requirement that common questions of law or fact *predominate* should be engrafted onto § 216(b). That re-quirement was not part of Rule 23 prior to the 1966 amendments, and the Advisory Committee Notes to those amendments indicate: "The present provisions of 29 U.S.C. § 216(b) are not intended to be affected by Rule 23, as amended." *See also Heagney v. European American Bank,* 122 F.R.D. 125, 127 n. 2 (E.D.N.Y.1988) ("[T]he similarly situated requirement of 29 U.S.C. § 216(b) is considerably less stringent than the requirement of Fed.R.Civ.Proc. 23(b)(3) that common questions predominate.").

■ ·AMR devotes a large portion of its brief detailing questions of fact that are not common to all plaintiffs. At least as to the commonality requirement of Rule 23(a), AMR's argument misses the mark. As I said, Rule 23(a) does not require that common questions of law or fact "predominate." In fact, all that can be gleaned from the rule itself is that more than one common question of law or fact need exist. 7A Charles Alan Wright, Arthur R. Miller, Mary Kay Kane, *Federal Practice and Procedure:* Civil 2d § 1763 at 198 (1986); *Stewart v. Winter,* 669 F.2d 328, 335, n. 16 (1982); *see also Joseph v. General Motors Corp.,* 109 F.R.D. 635, 639 (D.C.Colo.1986) (stating that total commonality is not required). Therefore, although I will discuss the numerous and significant issues that are not common to this putative class in the next section, those differences are irrelevant to a determination of commonality under Rule 23(a)(2). This is a significant defect with a Rule 23(a) definition of "similarly situated."

Common questions do exist here. For example: Is AMR entitled to the good faith defense under § 259 based on its alleged reliance upon administrative interpretation of the FLSA? What were the conditions at each station during sleeping hours? What were the actual job duties of paramedics, EMTs, dispatchers, and cabulance drivers? Therefore, significant questions exist that are common to the class as a whole and the commonality requirement of Rule 23(a) is satisfied.

■ The typicality requirement of Rule 23(a) presents a slightly higher hurdle. "This factor, along with adequacy of repre-

sentation, focuses on the characteristics of the class representative(s)." *Wilkerson v. Martin Marietta Corp.*, 875 F.Supp. 1456, 1462 (D.Colo.1995). Here, I focus on the relationship between the alleged harm to the representative plaintiffs and the alleged conduct of AMR affecting the class. "Typicality exists where the injury and the conduct are sufficiently similar." *Id.* (citing *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir.1988)). In addition, "differing fact situations of class members do not defeat typicality under Rule 23(a)(3) so long as the claims of the class representative and class members are based upon the same legal or remedial theory." *Adamson v. Bowen*, 855 F.2d 668, 676 (10th Cir.1988); *Penn v. San Juan Hospital, Inc.*, 528 F.2d 1181, 1189 (10th Cir.1975); 7A C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure:* Civil 2d § 1764 at 243 (1986). Further, disparities in damages claimed by the representative parties and the other members of the class do not warrant decertification. Wright, Miller & Kane, *supra* § 1764 at 241; *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332 (11th Cir. 1984), *cert. denied*, 470 U.S. 1004, 105 S.Ct. 1357, 84 L.Ed.2d 379 (1985).

AMR identifies several issues regarding which plaintiffs were in different factual situations from each other and/or are claiming disparate damages. None of plaintiff's examples would defeat certification under Rule 23(a). Rule 23(a) requires only that plaintiffs claims are typical of the class in that they rely on the same legal or remedial theory. Here, all plaintiffs' theories are the same— AMR violated the FLSA by failing to pay adequate mealtime, sleeptime, and/or overtime compensation. Moreover, arguably, subclasses could be established such that the representative plaintiff for each subclass would make the same claims as each plaintiff in that subclass. Plaintiffs in this case were employed in one or more of five positions for AMR: ambulance driver, ambulance attendant, cabulance driver, cabulance attendant, or dispatcher. AMR argues that plaintiffs who were employed in one capacity do not have claims that are typical of those who were employed in another position; however, the representative plaintiffs include one or more persons from each of these categories. Subclasses could, therefore, be crafted to account for these problems with typicality.

AMR also argues that because one of its defenses to the sleeptime claims is that it had an implied agreement with plaintiffs that they would not be paid for interrupted sleep, the class should be decertified. To prove an implied contract existed, AMR must show a meeting of the minds, and AMR argues that it cannot do so without a separate trial for each plaintiff. AMR's argument is, again, misplaced in this context. Rule 23(a)(3) provides only that "the claims or defenses *of the representative parties* are typical of the claims or defense *of the class."* That *AMR's* defenses to the claims of the plaintiffs vary is irrelevant to this inquiry (which is another significant flaw in this approach). Here, Rule 23(a)'s typicality requirement is satisfied.

Where, as here, more than one common question exists and the claims of the representative plaintiffs are typical of those of the class members, Rule 23(a)'s commonality and typicality requirements are satisfied, and, under *Krueger*, plaintiffs could proceed collectively. Without more, however, the *Krueger* test makes little sense. Absent the more stringent safeguards of other subsections of Rule 23, any number of cases would be permitted to proceed collectively under § 216, even where, as here, individual questions of liability dominate and a collective action is unworkable and prejudicial to the defendant.

Perhaps the answer, then, lies in applying all elements of Rule 23 to determine whether plaintiffs are similarly situated under § 216(b). That approach has problems of its own.

### B. *Modern Rule 23*

Several courts have held that plaintiffs must meet all of the requirements of a modern Rule 23 class action to proceed collectively under § 216(b). *See, e.g., Shushan v. University of Colorado*, 132 F.R.D. 263 (D.Colo. 1990); *St. Leger v. A.C. Nielsen Co.*, 123 F.R.D. 567 (N.D.Ill.1988) (stating that certification was inappropriate because common questions did not predominate). The leading

case advocating this approach is *Shushan.* There, the court reasoned that there was no apparent reason why "district courts should fail to utilize existing procedures, embodied in Rule 23, which are designed to promote effective management, prevent potential abuse, and protect the rights of all parties." *Id.* at 268.

The court was unpersuaded by the argument, accepted by many courts, that R. 23 and § 216 are wholly unrelated because the former provides for "opt-outs" and the latter for "opt-ins": "[I]t does not seem sensible to reason that, because Congress has effectively directed the courts to alter their usual course and not be guided by rule 23's 'opt-out' feature in ADEA class actions, it has also directed them to discard the compass of rule 23 entirely and navigate the murky waters of such actions by the stars or whatever other instruments they might fashion." *Id.*

The *Shushan* court analogized § 216(b) to a "spurious" class action (pre–1966 amendment to Rule 23), which also contained an opt-in provision. A number of courts prior to 1966 treated collective actions under § 216(b) as spurious class actions. *See* discussion, *infra.* Accordingly, the court concluded that all requirements of Rule 23 class action that do not conflict with the provisions of § 216 must be satisfied. In particular, the court stated that many of Rule 23's requirements have nothing to do with whether plaintiffs must opt-in or opt-out and everything to do with effective case management. For example, the court stated that Rule 23(a)'s four prerequisites and 23(b)(3)'s requirement that common questions of fact predominate should be used to determine whether plaintiffs are similarly situated. *Shushan,* 132 F.R.D. at 267.

Applying *Shushan* to the facts here, I would decertify the class. Were this a Rule 23 class action, plaintiffs would be seeking certification under Rule 23(b)(3). Plaintiffs could not be certified under Rule 23(b)(1) because there is no risk of (1) inconsistent verdicts that would establish incompatible standards of conduct for AMR, or (2) verdicts that would, as a practical matter, be dispositive of the rights of others not parties to this action. In addition, plaintiffs could not bring an action under Rule 23(b)(2) because they seek money damages as opposed to injunctive relief. Therefore, according to Rule 23(b)(3), plaintiffs would need to show that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." Common questions do not predominate here.

For example, pursuant to this order, plaintiffs will be permitted to pursue their mealtime claims to a limited extent. With the exception of mealtime claims for dispatchers (which were not the subject of my September 4, 1996, order), I held that defendant's stated policy of deducting one hour of mealtime if an employee had a forty-five minute period in which he could have eaten does not violate the FLSA. My order today does not change that holding. Rather, with the exception of dispatchers, plaintiffs' mealtime claims will be limited to showing that defendant did not follow its stated policy. Plaintiffs vary dramatically in their accounts of whether defendant followed the stated policy, and the evidence appears to reflect that only certain management personnel of defendant may have strayed from that policy. Accordingly, each plaintiff's proof of violation will be individualized because it depends upon how or whether defendant's policy was implemented by individual managers with regard to individual plaintiffs, not what the policy was.

Plaintiffs' sleeptime claims are equally troublesome. 29 C.F.R. § 785.22 provides that when an employee is required to be on duty for twenty-four hours or more, the employer and the employee may agree to exclude bona fide, regularly-scheduled sleeping periods of not more than eight hours from hours worked, provided that adequate sleeping facilities are furnished by the employer and the employee can usually enjoy an uninterrupted night's sleep. If the sleeping period is interrupted by a call to duty, the interruption must be counted as hours worked. If the sleep period is interrupted to such an extent that the employee cannot get at least five hours of sleep, the entire time is working time.

Defendant deducted eight hours from a twenty-four-hour shift as sleeptime, but paid the employees for company business performed during sleeptime. Sleeptime deduction did not apply to cabulance drivers, dispatchers or other employees who did not work twenty-four hour shifts. If the company business exceeded three and one-half hours, the employees were paid for the entire eight hours. Defendant admits that it was incorrect in using a three and one-half hour threshold instead of a three hour threshold as the regulation requires. Def. Mot. to Decert., p. 8, n. 4. Nevertheless, numerous issues that vary on an individual basis must be determined to establish liability as to each plaintiff.

For example, regarding whether an individual plaintiff could have "usually" enjoyed an uninterrupted night's sleep, several factors are unique to each plaintiff:

1. *Call Volume*—The primary interruptions to plaintiffs' sleep resulted from calls to duty. The number of calls to duty, however, varied significantly among stations and plaintiffs. According to AMR, fifty plaintiffs averaged 1.9 calls or less during an average sleep period, while eight plaintiffs averaged 2.9 or more calls. Duree Aff. at ¶ 3. Plaintiffs' own estimates show even greater variations. Ten plaintiffs stated in affidavits that they averaged two calls or less during a typical sleeptime, while fourteen plaintiffs alleged an average of five or more calls during sleeptime. Jacobson Aff. at ¶ 2. Accordingly, the estimates of both AMR and plaintiffs show that sleeptime varied significantly among individual plaintiffs. *See* Def. Mot. to Decert., pp. 8–9.

2. *Sleep Habits*—Plaintiffs claim that AMR should be required to pay them not only for time spent running a call but also for the time it took them to get back to sleep after running a call or being awakened when another crew went out for a call. Plaintiffs' estimates about how long it took them to get back to sleep after an interruption show significant variation. For example, twelve plaintiffs have stated that it took forty-five minutes or more to get back to sleep, whereas nine stated that it took fifteen minutes or less. Jacobsen Aff. at ¶ 8.

3. *Station Variations*—Variations in the conditions present at individual stations also contributed to the disparities in sleeptime among plaintiffs. Some plaintiffs contend that they were kept awake by tones that sounded at the fire stations where they were located. Only four ambulance crews were located at fire stations. Other plaintiffs state that they were kept awake by scanners located at the stations. Some stations did not have scanners, and others turned down the scanners at night. Some plaintiffs contend they were awakened by other crews going out on calls or filling their oxygen tanks. Only four stations housed two different crews, and only four stations refilled oxygen tanks. Def. Mot. to Decert., p. 9–10.

Plaintiffs argue that AMR can defend itself adequately using evidence of averages. Because plaintiffs moved around and worked in various stations, plaintiffs contend that evidence of conditions at each station would need to be presented even at a trial for an individual plaintiff. In addition, plaintiff argues that it would present evidence of AMR's treatment of all plaintiffs, even at an individual trial, as evidence under F.R.E. 404(b) to show AMR's reckless disregard for the law. Therefore, plaintiffs argue that they are similarly situated and can proceed collectively. I disagree.

AMR denies all liability for sleeptime claims because, it asserts, plaintiffs impliedly agreed to its sleeptime policy, thereby precluding recovery. To show an implied agreement, AMR must show a meeting of the minds. AMR cannot, of course, prove a meeting of the minds between AMR and the plaintiffs as a class through some sort of "averaging." That issue will involve questions whether a particular plaintiff complained about the policy, was misled by management regarding the policy, etc. Accordingly, questions of whether there were implied agreements between AMR and plaintiffs regarding AMR's sleeptime policy must be addressed individually.

In addition, plaintiff's argument mischaracterizes the question before me. Even if this case *could* be effectively managed as a collective action, plaintiffs have the burden of

showing that they are similarly situated. Thus, for the moment, I am assuming that plaintiffs must show that common questions of fact or law predominate, and I am not persuaded that they do. Even assuming that averages were used to generalize the sleeping conditions at each station, significant individual issues remain (e.g., individual sleep habits, how much time each plaintiff spent at each station, whether each plaintiff impliedly agreed to AMR's sleeptime policy, etc.) Therefore, treating this under the strict Rule 23 standard advocated by *Shushan*, I would decertify the class.

*Shushan* has been criticized by a number of courts, however, most of which agree that modern Rule 23 requirements, while instructive, are not prerequisites to maintaining a collective action under § 216(b). *See, e.g., Church v. Consolidated Freightways, Inc.,* 137 F.R.D. 294, 306 (N.D.Cal.1991): *Jackson v. New York Tel. Co.,* 163 F.R.D. 429 (S.D.N.Y.1995). I agree the *Shushan* approach is problematic, but for different reasons. In *Church*, for example, the court stated that because several courts had determined that plaintiffs were precluded from bringing Rule 23 class actions under the FLSA or ADEA, it followed that plaintiffs did not need to meet any of the requirements of Rule 23 to show that they were similarly situated. 137 F.R.D. at 305–06 (citing *Schmidt v. Fuller Brush Co.,* 527 F.2d 532, 536 (8th Cir.1975); *LaChapelle v. Owens-Illinois, Inc.,* 513 F.2d 286, 289 (5th Cir. 1975); *Kinney Shoe Corp. v. Vorhes,* 564 F.2d 859, 862 (1977)). The cases relied upon in *Church*, however, are inapposite.

*Schmidt* and *LaChapelle* held that plaintiffs are not permitted to bring a Rule 23 class action under the FLSA or ADEA because Rule 23's opt-out provision is in direct conflict with the opt-in provision of § 216(b). *Schmidt*, 527 F.2d at 536; *LaChapelle*, 513 F.2d at 289. Those opinions offer no guidance on how to interpret "similarly situated" under § 216(b). Rather, the Fifth and Eighth Circuits simply concluded that § 216(b), however interpreted, is the only means by which plaintiffs can bring collective actions under the FLSA and ADEA. *Id.*

In *Kinney*, the Ninth Circuit extrapolated from *Schmidt* and *LaChapelle* and stated that because Rule 23 and § 216 are "mutually exclusive" and "irreconcilable" (quoting *Schmidt* and *LaChapelle),* "adoption of a portion of the procedures from Rule 23 would be just as contrary to the congressional intent as total adoption of the rule." *Kinney*, 564 F.2d at 862 (quoting *McGinley v. Burroughs Corp.,* 407 F.Supp. 903, 911 (E.D.Pa.1975)). Accordingly, the court held that plaintiffs suing in a representative capacity under § 216(b) were not entitled to circulation of court-approved notice to potential class members, a feature of Rule 23.

The Supreme Court, however, directly obviated the holding of *Kinney* in *Hoffmann (sic)–La Roche, Inc. v. Sperling,* 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989), holding that a district court has the discretion to send notice to potential class members under § 216(b) derived from its "managerial responsibility to oversee the joinder of additional parties." 493 U.S. at 170–71, 110 S.Ct. at 486. Indeed, in reaching its conclusion, the Court in *Sperling* analogized § 216 representative actions to class actions under Rule 23. *Id.*

Thus, none of the case law principally relied upon by *Church* supports its criticism of *Shushan*. *Shushan* recognized that the conflict between the opt-in provision of § 216(b) and the opt-out provision of Rule 23 does not mean that other parts of Rule 23 cannot be used to define "similarly situated" in § 216(b). *Shushan* represents a herculean effort to provide structure to the nebulous "similarly situated" standard by turning to the time-tested notions of Rule 23. Unfortunately, with due respect to my colleague who eloquently authored the opinion, I believe *Shushan* looks to the wrong Rule 23.

Although *Shushan* acknowledges that prior to the 1966 amendments to Rule 23, § 216 collective actions were often treated as "spurious" class actions, it adopts modern Rule 23 standards without explanation. *See also Mooney v. Aramco Services Co.,* 54 F.3d 1207, 1214 (5th Cir.1995) (mischaracterizing *Shushan* as advocating spurious class action treatment of § 216 actions). For example, *Shushan* states that Rule 23(b)(3)'s require-

ment that common questions of fact or law "predominate" should be part of a court's decision whether plaintiffs are similarly situated. 132 F.R.D. at 267. As discussed, however, that requirement was not part of Rule 23 prior to 1966, and the Advisory Committee Notes to the 1966 amendments make it clear that the amendments were not intended to affect § 216(b) actions. Therefore, if Rule 23's standards apply to § 216(b) at all, it must be through Rule 23 as it existed prior to 1966.

I turn then to those cases that treat § 216(b) actions as "spurious class actions" under the former Rule 23.

### C. *Spurious Class Actions*

Prior to 1966, Rule 23 stated:

If persons constituting a class are so numerous as to make it impracticable to bring them all before the court, such of them, one or more, as will fairly insure the adequate representation of all may, on behalf of all, sue or be sued, when the character of the right sought to be enforced for or against the class is

(1) joint, or common, or secondary in the sense that the owner of a primary right refuses to enforce that right and a member of the class thereby becomes entitled to enforce it;

(2) several, and the object of the action is the adjudication of claims which do or may affect specific property involved in the action; or

(3) several, and there is a common question of law or fact affecting the several rights and a common relief is sought.

The three variations of a class action came to be referred to as true, hybrid, and spurious, respectively. Prior to 1966, many courts treated collective actions brought under § 216(b) as "spurious" class actions. *See* Wright, Miller & Kane, supra, § 1752, at 31–33; *Pentland v. Dravo Corp.,* 152 F.2d 851, 852 (3d Cir.1945). Given that the 1966 amendments to Rule 23 were not intended to affect § 216(b) actions, there is some support for treating § 216(b) actions as spurious class actions under the former Rule 23. *See Lusardi v. Xerox Corp.,* 855 F.2d 1062, 1074 n. 15 (3d Cir.1988) (relying on Spahn, *Resur-*

*recting the Spurious Class: Opting–In to the Age Discrimination in Employment Act and Equal Pay Act through the Fair Labor Standards Act,* 71 Geo.L.J. 119, 139 (1982)). Indeed, the Tenth Circuit, although not addressing the question before me here, has referred to a collective action under § 216(b) as a "spurious class action." *Equal Employment Opportunity Commiss. v. Sandia Corp.,* 639 F.2d 600, 602 (10th Cir.1980).

The three categories created by the former Rule 23 proved to be highly problematic. According to Professor Zechariah Chaffee: "This tribute to the memory of Wesley Hofeld would be more suitable in a law review article than in an enactment which is to guide the actions of practical men day in and day out." Chaffee, *Some Problems in Equity,* 246 (1950). Courts were constantly baffled as to the correct category under which to proceed. No clear lines divided the true, hybrid, and spurious classes. *See Pentland,* 152 F.2d at 852 ("It may be admitted that the terminology shocks the aesthetic sense and the succession of adjectives before the noun shows the poverty of imagination in choice of terms characteristic of the legal profession.") Another significant problem with the rule was that judges were provided no express discretion to refuse class certification when the tests of the rule were met. Wright, Miller & Kane, *supra,* § 1752, at 17. Even where the most important issues of a case were so individual to make class treatment highly inefficient, nothing in the rule gave a district court the discretion to refuse class certification. *Id.*

This was especially troublesome in connection with "spurious" class actions. Spurious classes were those tied together only by common questions of fact or law, as opposed to "true" or "hybrid" classes in which the disposition of one class member's rights might affect the rights of others in the class. To certify a spurious class, a party needed only show that one common question of fact or law existed among the class and that they sought a common relief. Courts interpreted the "common relief" provision to require only that the same type of relief be sought from a common source. *See Kainz v. Anheuser–Busch, Inc.* 194 F.2d 737, 743 (7th Cir.), *cert.*

*denied,* 344 U.S. 820 (1952). Accordingly, a considerable number of cases involving one common question but confounded with overwhelming individual questions would, under a plain reading of the rule, be certified as a class action.

The 1966 amendments to Rule 23 addressed both problems by eliminating the ambiguous class divisions and providing the court with greater discretion to refuse class certification where class treatment would be inefficient or prejudicial. *Id.;* Fed.R.Civ.P. 23(b)(3) (including the requirement that "a class action is superior to other available methods for the fair and efficient adjudication of the controversy"). The question then is whether discretion exists to refuse certification under § 216(b) if the test for "similarly situated" is to be equated with a spurious class certification under former Rule 23. I conclude that such discretion exists.

Despite the broad language of former Rule 23, even prior to the 1966 amendments, courts exercised discretion whether to certify a spurious class. Wright, Miller & Kane, *supra,* § 1752, at 29. "It was said that the 'spurious' class action was allowed as a matter of efficiency to avoid multiplicity of actions and the joinder of parties in these actions was subject to the discretion of the court." *Id.; Knowles v. War Damage Corp.,* 171 F.2d 15 (D.C.Cir.1948), *cert. denied,* 336 U.S. 914, 69 S.Ct. 604, 93 L.Ed. 1077 (1949). In fact, many courts considered a spurious class action simply an alternate device for the permissive joinder of parties without the need for complete diversity of parties. *See, e.g., California Apparel Creators v. Wieder of Calif., Inc.,* 162 F.2d 893, 897 (2d Cir.), *cert. denied,* 332 U.S. 816, 68 S.Ct. 156, 92 L.Ed. 393 (1947).

The Tenth Circuit rejected the notion that a spurious class action was merely a permissive joinder device, but it did not address whether a court had discretion to deny certification of a spurious class where fairness and efficiency mandated it. *Union Carbide & Carbon Corp. v. Nisley,* 300 F.2d 561 (10th Cir.1961), *cert. dismissed,* 371 U.S. 801, 83 S.Ct. 13, 9 L.Ed.2d 46 (1962). Rather, the court rejected only the premise that members of a successful plaintiff class could not

opt-in after the verdict. *Id.* at 589. I found no Tenth Circuit authority regarding whether a court had discretion under former Rule 23 to deny spurious class certification for equitable reasons. Accordingly, I conclude that the Tenth Circuit would have followed the general rule that regardless of the deafening silence of former Rule 23, district courts had inherent authority to refuse to proceed collectively where it would waste judicial resources or unfairly prejudice the party opposing the proposed class.

Viewing this case in terms of a spurious class action, decertification is appropriate. Although plaintiffs have met the minimal burden for a spurious class action set forth in former Rule 23, in the exercise of my discretion, I conclude that a collective action would be both inefficient and unfairly prejudicial to AMR. As discussed, common questions of fact exist in this case; however, significant issues regarding the liability of AMR to individual plaintiffs are also present. Individual questions of liability on both mealtime and sleeptime claims are simply too numerous and significant to allow this case to proceed efficiently as a collective action.

In addition, there is a significant risk of prejudice to AMR. Even if it were possible to proceed efficiently with this case as a collective action using averaging and F.R.E. 1006 summaries, a jury would be instructed, as a matter of law, that all members of the plaintiff class (or subclass) are similarly situated. AMR would then be forced to argue to the jury that the plaintiffs, in effect, are *not* similarly situated, and some or all plaintiffs deserve no relief. A jury is likely to be confused. Indeed, a collective action is designed to permit the presentation of evidence regarding certain representative plaintiffs that will serve as evidence for the class as a whole. It is oxymoronic to use such a device in a case where proof regarding each individual plaintiff is required to show liability.

Therefore, equating a collective action to a spurious class action under the former Rule 23, I would decertify the class. The question remains, however, why Rule 23, even in its pre–1966 incarnation, should serve as the definition for "similarly situated" in § 216(b). Specifically, I have uncovered no case or

other authority explaining why collective actions were treated as spurious class actions in the first place. Section 216 does not reference Rule 23, and I have not discovered any reason why the definition of "similarly situated" did not evolve independently. Nevertheless, courts appear to have assumed that § 216 could not stand alone and needed to be pigeon-holed into one of the former Rule 23 categories. *See Pentland*, 152 F.2d at 852 (assuming from the outset that a § 216(b) collective action must be treated as true, hybrid, or spurious).

On June 25, 1938, the date of § 216(b)'s enactment, the Federal Rules of Civil Procedure had been proposed and were pending before Congress, but they had not yet become effective. *Lusardi*, 855 F.2d at 1070. One problem regarding the common law of class actions in 1938 was the binding effect of the class action decree on absent class members. *Id.* To address due process concerns, Congress passed § 216(b), thereby creating an opt-in class. Similarly, the Advisory Committee on the Federal Rules provided for an opt-in class under former Rule 23(a)(3), the spurious class provision. *Id.* Congress permitted Rule 23(a)(3) to become effective by not objecting to it. *See* 28 U.S.C. § 2072.

Therefore, in 1938 Congress had before it both Rule 23 and § 216; yet the language used in each is wholly dissimilar. It could be said that such differences evidence an intent to create distinct standards for an opt-in class. It may be assumed that Congress considered the proposed Rule 23(a) in 1938 in light of the newly passed § 216 and consciously decided to create different standards. It may also be assumed that a rule and a statute, using distinct language and drafted by different entities, were not intended to be interpreted identically. It seems entirely plausible that Rule 23, regardless of vintage, should not even be considered in defining "similarly situated" under § 216(b). Accordingly, I must address a final proposed standard for § 216(b): ad hoc determination.

### D. *Ad Hoc Determination of Similarly Situated*

Several courts have interpreted § 216(b) by considering simply the words of the statute itself and the purposes for which it was passed, without reference to Rule 23. This line of cases is typified by *Lusardi v. Xerox Corp.*, 118 F.R.D. 351 (D.N.J.1987), *vacated in part on other grounds*, 122 F.R.D. 463 (D.N.J.1988). There, the district court conditionally certified a case as a collective action under the ADEA for notice purposes. Generally, at the notice stage, courts following this line of cases "require nothing more than substantial allegations that the putative class members were together the victims of a single decision, policy, or plan...." *Sperling v. Hoffman–La Roche, Inc.*, 118 F.R.D. 392, 407 (D.N.J.), *judgment aff'd in part, appeal dismissed in part*, 862 F.2d 439 (3d Cir.1988), *judgment aff'd and remanded*, 493 U.S. 165, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989). The court then makes a second determination after discovery has been completed and the case is ready for trial. At this second stage, the standard for "similarly situated" is higher; however, these courts have not articulated a definition for "similarly situated," relying instead upon general principles of judicial economy and fairness. For example, in *Lusardi*, the court addressed several factors in determining that the case should be decertified at the second stage:

> For several reasons, including (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to Xerox which appear to be individual to each plaintiff; (3) fairness and procedural considerations; and (4) the apparent absence of filings required by the ADEA prior to instituting suit, the class will be decertified.

118 F.R.D. at 359. On remand, the *Lusardi* court examined a variety of similar factors and, again, decertified the class. *Lusardi v. Xerox Corp.*, 122 F.R.D. 463, 465–66 (D.N.J. 1988).

Other district courts have also decided decertification issues without defining "similarly situated." *See, e.g., Plummer v. General Electric Co.*, 93 F.R.D. 311, 312 (E.D.Pa. 1981); *Owens v. Bethlehem Mines Corp.*, 108 F.R.D. 207, 209 (S.D.W.V.1985); *Burgett v. Cudahy Co.*, 361 F.Supp. 617 (D.Kan.1973); *Allen v. Marshall Field & Co.*, 93 F.R.D. 438 (N.D.Ill.1982). In each case, the court was

content to decide the question ad hoc, based upon the plain language of the statute and general principles of judicial economy and fairness to the litigants. Although *Lusardi* recognized that Rule 23 class action requirements may be instructive, the court stated that they are "not controlling or even required to be considered." 118 F.R.D. at 359, n. 18.

*Lusardi* also indicates that courts should consider whether certification would serve the purposes and putative benefits of a collective action under § 216. The Supreme Court has identified the main benefits of a collective action under § 216(b): "A collective action allows ... plaintiffs the advantage of lower individual costs to vindicate rights by the pooling of resources. The judicial system benefits by efficient resolution in one proceeding of common issues of law and fact arising from the same alleged ... activity." *Hoffmann (sic)–La Roche Inc. v. Sperling,* 493 U.S. 165, 170, 110 S.Ct. 482, 486, 107 L.Ed.2d 480 (1989).

To date plaintiffs have enjoyed collective benefits in discovery, case management, and trial preparation. The benefits to the plaintiffs in allowing this action to proceed collectively are also significant. The FLSA is a remedial statute, and it seems likely that at least some of the individual plaintiffs would not go forward with this suit if the class is decertified because the costs would be prohibitive. In addition, avoiding the prospect of eighty separate trials upon decertification may serve some measure of judicial economy. However, given the number of individual issues that must be resolved, I am not persuaded that a single trial would save significant time or effort.

██ In addition, *Lusardi* cautions that I should balance these putative benefits against any prejudice to the defendant and any judicial inefficiencies that may result from allowing plaintiffs to proceed collectively. Further, regardless of the potential benefits, plaintiffs still must meet their burden of showing that they are similarly situated. Because I conclude that plaintiffs have not met that burden, and proceeding collectively would significantly prejudice the defendant, I will decertify the plaintiffs' class.

In *Lusardi,* despite there being some common questions among the class and a collective action would have avoided some repetition of evidence and argument, the court decided that plaintiffs were simply not similarly situated within the meaning of the statute. The same holds true here.

As discussed, this case is fraught with questions requiring distinct proof as to individual plaintiffs. Issues requiring individualized proof, such as call volume, sleep habits, conditions at particular stations, and treatment under AMR's mealtime policy, dominate plaintiffs' claims. In addition, AMR's defense that plaintiffs impliedly agreed to AMR's sleeptime policy cannot be addressed on a class-wide basis. Simply put, under a plain reading of § 216(b) and bearing in mind the purposes of a collective action, I find and conclude that plaintiffs are not similarly situated.

## IV. CONCLUSION

Therefore, under every recognized test, except *Krueger,* which I reject as being too lenient, plaintiffs are not similarly situated under § 216(b). For the purposes of this case, the other three tests produce the same result. As to future cases, however, the results may vary depending upon the test employed. For example, strict compliance with Rule 23(b)(3)'s requirement that common questions predominate would appear to be a more stringent standard than either the discretionary certification of a spurious class or the ad hoc approach of *Lusardi.* To the extent that is true, I would apply the *Lusardi* approach, which affords flexibility in weighing concerns for judicial economy against unfair prejudice to a defendant tempered by the remedial purposes of the FLSA. Despite the unpredictability of an ad hoc approach, I see no basis to conclude that the paradigm of Rule 23 can be engrafted upon § 216(b).

Accordingly, I will decertify the plaintiffs' conditionally certified class, with the exception of plaintiffs who worked as dispatchers. Dispatchers will be permitted to proceed collectively. In addition, plaintiffs have consented to the use of separate liability ver-

dicts. Therefore, I will grant AMR's motion for separate liability verdicts as to the dispatchers. AMR's motion for separate liability verdicts and subclasses is otherwise mooted by the decertification of the rest of plaintiffs' class.

Accordingly, it is ORDERED that:

1. Plaintiffs' request for reconsideration is GRANTED IN PART, and my ORDER of September 4, 1996, is VACATED IN PART to the extent that I granted summary judgment to defendant on plaintiffs' mealtime compensation claims;

2. Defendant's motion to decertify is GRANTED, except to the extent that those plaintiffs who worked as dispatchers may proceed collectively on their mealtime claims.