**Margaret REED, individually and on behalf of all others similarly situated, Plaintiffs,**

**v.**

**COUNTY OF ORANGE et al., Defendants.**

**No. SACV05–01103–CJC(ANx).**

United States District Court,
C.D. California,
Southern Division.

Jan. 8, 2010.

M. Alim Malik, Roger M. Franks, Jackson DeMarco Tidus & Peckenpaugh, Irvine, CA, Kenneth L. Mariboho, II, Miguel G. Caballero, Michael G. Dawson, Greg K. Hafif, Fenja Klaus, Herbert Hafif Law Offices, Claremont, CA, Gregory G. Peterson, The Peterson Law Firm, Newport Coast, CA, for Plaintiffs.

Elizabeth Tom Arce, Melanie D. Long, G. Arthur Meneses, Brian P. Walter, Liebert Cassidy Whitmore, Los Angeles, CA, Teri L. Maksoudian, Marianne Van Riper, Orange County Counsels Office, Santa Ana, CA, for Defendants.

## ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DECERTIFY CONDITIONAL FLSA CLASS

CORMAC J. CARNEY, District Judge.

### I. INTRODUCTION

Plaintiff Margaret Reed initiated this collective action on behalf of herself and other sheriffs' deputies employed by the Orange County Sheriff's Department ("OCSD") under the federal Fair Labor Standards Act ("FLSA"). Plaintiffs allege that the OCSD maintains an unofficial policy and practice of training and discouraging deputies from reporting off-the-clock work and did not compensate deputies for donning and doffing uniforms, a myriad of pre-shift and post-shift activities, missed meal breaks and work tak-

en home. Before the Court is OCSD's motion to decertify the collective action pursuant to 29 U.S.C. § 216(b). The Court finds that Plaintiffs have presented substantial evidence that they are similarly situated with respect to their donning and doffing claims because nearly all deputies are required to don and doff uniforms, most often without compensation, and the OCSD has essentially admitted that it views those activities as noncompensable under the FLSA. However, the Court finds that Plaintiffs are not similarly situated with respect to their remaining claims because they arise out of disparate factual and employment settings, rebutting the claims will require individualized defenses, and the interests of justice and judicial efficiency will be frustrated if these claims proceed on a collective basis. Accordingly, OCSD's motion to decertify the collective action is GRANTED in part and DENIED in part.

## II. FACTUAL BACKGROUND

OCSD deputies are introduced to entry-level law enforcement at the OCSD Academy. The Academy is a regional training academy that operates in cooperation with Santa Ana College, and it serves the OCSD and 44 other police departments. (Meneses Decl., Ex. YYYYYY, B. Newmeyer Depo. at 22–23.) Recruits are sent from many different departments, and some individuals enroll without a department sponsor. (Meneses Dec., Ex. YYYYYY, B. Newmeyer Depo. at 41–42.) The Academy employs nearly 100 teachers, some of whom are sworn personnel or retired from the OCSD, and others who are civilian. (Meneses Decl., Ex. YYYYYY, B. Newmeyer Depo. at 35–36.) Recruits receive some college credit from Santa Ana College for the hours spent at the Academy. (Meneses Decl., Ex. YYYYYY, B. Newmeyer Depo. at 166.) Once they leave the Academy, deputies enter into a probationary and training period, during which they are taught how to fill out time sheets. (Senf Decl., Ex. 30, D. Nighswonger Depo. at 40:2–21.) OCSD deputies are most commonly assigned to one of the court or jail facilities post-graduation. (Meneses Decl., Ex. YYYYYY, B. Newmeyer Depo. at 26.) Thereafter, deputies can occupy a wide range of assignments, including various patrol assignments, jail, courts, transportation, administration, investigation, and other specialized assignments. Once they are on-duty officers, deputies are given broad discretion in the performance of their duties. (D. Nighswonger Decl. ¶¶ 9–13.)

Most OCSD deputies are paid on an hourly basis. (D. Nighswonger Decl. ¶ 14.) Most deputies assigned to patrol or one of the correctional facilities start their shifts at a briefing, though certain kinds of deputies might not attend a briefing at the start of their shift. (D. Nighswonger Decl. ¶ 10.) OCSD's official work hours reporting policy is included in the Rules and Regulations Manual and Memorandum of Understanding ("MOU") issued to OCSD employees. (Senf Decl., Exs. 34–36; Nighswonger Decl., Exs. 118, 119, and D.) Plaintiffs are governed by the MOU and Manual. (Senf Decl., Exs. 34 and 35.) To ensure payment, OCSD's official policy requires deputies to report the time that they spend performing their duties. (Nighswonger Decl., Exs. 118 and 119.) Specifically, the policy states:

> It is the responsibility of all employees to report all overtime hours to their supervisors, regardless of where the overtime was worked.

(Senf Decl., Ex. 36, Section 1.05.5; D. Nighswonger Decl. ¶ 14.) A deputy who wishes to work overtime must seek the approval of a supervisor when practical, but OCSD policy is that deputies must notify their supervisors of all hours worked, regardless of when they occurred. (D. Nighswonger Decl. ¶ 14; W. Lapinski Decl. ¶¶ 10, 14.)

Plaintiffs allege that the OCSD trains deputies, from the time they start in the Academy, that they are required to work off-the-clock and also discourages deputies from reporting certain overtime worked and missed meal breaks. The "off-the-clock" work alleged includes a myriad of activities including but not limited to donning and doffing uniforms and equipment, maintaining equipment, preparing for briefing, checking out equipment, preparing reports, walking to and from various work areas, working through meal periods, and several deployment-related

activities. (First Amended Compl. ¶ 6.) Margaret Reed, the lead plaintiff in this case, is now joined by approximately 682 current and former deputies of the OCSD. (Brian P. Walter Decl. ¶ 2.)

## III. LEGAL STANDARD

The FLSA provides that "no employer shall employ any of his employees ... for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate not less than one and one-half times the regular rate at which he is employed." 29 U.S.C. § 207(a)(1). "[A]ny one or more employees for and in behalf of himself or themselves and other employees similarly situated" may bring an action for unpaid overtime compensation against an employer who is alleged to have violated the FLSA. *Id.* § 216(b). Employees wishing to join the suit must "opt-in" by filing a written consent with the court. *Id.*

District courts have discretion to determine whether certification of a § 216(b) collective action is appropriate. *Leuthold v. Destination Am.,* 224 F.R.D. 462, 466 (N.D.Cal.2004); *Smith v. T–Mobile USA, Inc.,* Case No. 05–5274 ABC (SSx), 2007 WL 2385131, at *2 (C.D.Cal. Aug.15, 2007). Many district courts, including this one, employ a two-tiered approach to decide whether certification is appropriate. *Leuthold,* 224 F.R.D. at 466. At the early Tier I stage, the court determines "based primarily on the pleadings and any affidavits submitted by the parties, whether the potential class should be given notice of the action." *T–Mobile,* 2007 WL 2385131, at *3. The "more rigorous" Tier II analysis is designed to determine—with the benefit of a more fully developed record—whether the plaintiffs are "similarly situated" to justify proceeding as a collective action. *Leuthold,* 224 F.R.D. at 467; *T–Mobile,* 2007 WL 2385131, at *7. The FLSA does not define the term "similarly situated," and there is no Ninth Circuit precedent interpreting the term. *Adams v. Inter–Con Sec. Sys., Inc.,* 242 F.R.D. 530, 536 (N.D.Cal. 2007); *see also Anderson v. Cagle's Inc.,* 488 F.3d 945, 953 (11th Cir.2007) (noting that "the more material distinctions revealed by the evidence, the more likely the district court is to decertify the collective action"); *Thiessen v. Gen. Elec. Capital Corp.,* 267 F.3d 1095, 1102 (10th Cir.2001) ("Unfortunately, [Section] 216(b) does not define the term 'similarly situated' and there is little circuit law on the subject."); *Olivo v. GMAC Mortg. Corp,* 374 F.Supp.2d 545, 548 n. 2 (E.D.Mich.2004) (noting that, at the second stage, courts should consider "whether certification would serve the purposes of a collective action under § 216(b), and then weigh the benefits of a collective action against the prejudice to the defendant and any judicial inefficiencies that could result from allowing Plaintiffs to proceed collectively.") However, the prevailing view is that plaintiffs bear the burden of proving that collective action treatment is appropriate. *Anderson,* 488 F.3d at 953; *Smith v. Heartland Automotive Servs., Inc.,* 404 F.Supp.2d 1144, 1149 (D.Minn. 2005); *Pfohl v. Farmers Ins. Group,* Case No. CV–03–3080 DT (RCx), 2004 WL 554834, at *2 (C.D.Cal. Mar.1, 2004). It is not sufficient for the plaintiffs' evidence to merely "successfully engage" the competing evidence offered by the defendant, rather, it is plaintiffs' burden to provide substantial evidence to demonstrate that they are similarly situated. *Castle v. Wells Fargo Fin., Inc.,* Case No. C–06–4347–SI, 2008 WL 495705, at *2 (N.D.Cal. Feb.20, 2008); *Smith v. Micron Electronics, Inc.,* Case No. CV–01–244–S–BLW, 2005 WL 5336571, at *2 (D.Idaho Feb.4, 2005).

■ In deciding whether plaintiffs have met their Tier II burden, courts weigh various factors that require the court to engage in a fact-specific inquiry. *Heartland Automotive,* 404 F.Supp.2d at 1149–50. These factors include: (1) the disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendants with respect to the individual plaintiffs; and (3) fairness and procedural considerations. *Id.* Recent federal cases considering FLSA certification have found that certification is not warranted in the absence of proof that plaintiffs' alleged injuries resulted from a single, unified policy. *T–Mo-*

*bile,* 2007 WL 2385131, at *6–*8; *Castle,* 2008 WL 495705, at *5.[1]

## IV. ANALYSIS

### A. Pre–Shift, Post–Shift, Work Taken Home, and Missed Meal Break Claims

#### a. Factual and Employment Settings

The first factor involves evaluating Plaintiffs' factual and employment settings. *T–Mobile,* 2007 WL 2385131, at *7. When analyzing plaintiffs' factual and employment settings, courts also evaluate whether plaintiffs have provided substantial evidence that their claims arise out of a single policy, custom or practice that leads to FLSA violations. *T–Mobile,* 2007 WL 2385131, at *6–*8; *Castle,* 2008 WL 495705, at *5 (finding that "plaintiffs have not identified any company-wide policy or practice to deny overtime and thus have failed to show that the various ... employees are similarly situated for purposes of class certification"); *see also Proctor v. Allsups Convenience Stores, Inc.,* 250 F.R.D. 278 (N.D.Texas 2008); *Micron,* 2005 WL 5336571, at *2 (decertifying class where some supervisors but not others appeared to permit or require off-the-clock work); *Bonilla v. Las Vegas Cigar Co.,* 61 F.Supp.2d 1129, 1139 n. 6 (D.Nev.1999). Here, Plaintiffs' factual and employment settings differ with respect to their pre-shift, post-shift missed meal break and work taken home claims, and additionally, Plaintiffs have not provided substantial evidence of a single OCSD decision, policy or plan to violate the FLSA with respect to those claims.

■ Decertification is appropriate where plaintiffs are subject to varying work conditions in different work locations or under different supervisors. *Proctor,* 250 F.R.D. at 282; *Brechler v. Qwest Communications Intl.,* Case No. CV–06–00940–PHX–ROS, 2009 WL 692329, at *2 (D.Ariz. March 17, 2009); *Johnson v. TGF Precision Haircutters, Inc.,* Case No. CV–H–03–3641, 2005 WL 1994286, at *2–*4 (S.D.Tex. Aug.17, 2005); *Lawrence v. City of Philadelphia,* No. 03–

CV–4009, 2004 WL 945139 (E.D.Pa. April 29, 2004). In *Lawrence,* plaintiffs all worked as Fire Service Paramedics within the City Fire Department's Emergency Medical Services Unit and had the same general job description. *Lawrence,* 2004 WL 945139, at *2. Plaintiffs' off-the-clock claims were similar to the ones currently alleged. *Id.* The court noted that the plaintiffs worked in "different unit types, different platoons, different locations, and [had] different supervisors." *Id.* Given this variation and the fact that plaintiffs' off-the-clock claims involved time not regularly worked by all members of the class, the court determined that the circumstances of the individual claims would vary too widely to be tried in a single action. *Id.* Similarly, in *Johnson,* the court decertified the class where both hair stylists and receptionists who had materially different responsibilities were included within the class, class members worked at several different locations, and the manner in which defendant's overtime policies were enforced was contingent on the particular store, not a company-wide policy. *Johnson,* 2005 WL 1994286, at *2–*4.

Plaintiffs assert that they are similarly situated because they are all employed by the OCSD and engage in similar law enforcement activities. (Pl. Opp. to Mot. to Decertify at 2.) The Court disagrees. These generalized commonalities do not make Plaintiffs similarly situated within the meaning of the FLSA. Instead, the disparity between Plaintiffs' factual and employment settings as to their pre-shift and post-shift activities, work taken home, and their meal breaks results in highly individualized questions of fact that make proceeding as a collective action impractical and prejudicial to the parties.

A deputy within the OCSD might be assigned to any number of job assignments, all with differing responsibilities. During the relevant statutory period, OCSD went from 14 to the current nine captains who oversee three Commands. (D. Nighswonger Decl. ¶ 5.) The Custody and Court Services Command oversees branches of the County's Su-

---

1. The Court conditionally granted Tier I certification by orders dated February 12, 2007 and December 17, 2007. The Court randomly select-

ed 200 Sample Plaintiffs to be deposed, and OCSD deposed 135 deputies. (B. Walter Decl. ¶ 2.)

perior Court and the County's correctional facilities. (D. Nighswonger Decl. ¶¶ 5–6.) The Field Operations & Investigative Services Command provides police patrol services to contract cities and unincorporated areas within the County as well as investigative services. (D. Nighswonger Decl. ¶ 5.) The Administrative Services Command includes three divisions, which are Financial–Administrative Services, Research and Development, and Communications. (D. Nighswonger Decl. ¶ 5.) All of the commands are further subdivided into facilities, bureaus and units.[2] Additionally, payroll divides the OCSD into pay locations, and each pay location represents a specific assignment within OCSD. (D. Ramos Decl. ¶ 2.) There are over 100 pay locations within the OCSD, which means there are over 100 separate work locations where a deputy might be assigned to work. (D. Ramos Decl. ¶ 2 and Ex. G.) Captain Timothy Board testified that the system for deputies to log in or log out from their shift depends ón a deputy's assignment. (Senf Decl., Ex. 25, T. Board Depo. at 49:5–11.) Sample Plaintiffs alone have worked in approximately 50 pay locations during the statutory period.[3] (D. Ramos Decl. ¶ 2 and Ex. F.)

The Custody and Court Services Command operates 5 correctional facilities, including Theo Lacy, Musick, Central Men's Jail, Central Women's Jail,[4] and the Intake Release Center. (D. Nighswonger Decl. ¶ 6.) Additionally, this Command operates seven court facilities. (D. Nighswonger Decl. ¶ 6.) Deputies assigned to corrections perform a wide range of duties, including monitoring the care and welfare of inmates, supervising inmate workers, and transporting and transferring ínmates to and from medical facilities, courts throughout the County, and other jails. (D. Nighswonger Decl. ¶ 6.) In con-

trast, court deputies provide security for the courts, serve as bailiffs in court rooms, and provide custody services for inmates making court appearances. (D. Nighswonger Decl. ¶ 6.)

Within Custody and Court Services, deputies may have a wide range of responsibilities. For example, at Theo Lacy jail, a deputy might be assigned to a prowler or guard station position in a module or to a barrack to monitor inmates. (W. Lapinski Decl. ¶ 5.) "The primary duty of Deputies assigned to a Module or Barrack is to monitor the inmates in their housing location ... Prowlers are also responsible for monitoring inmates but unlike the Deputies assigned to a Module or Barrack who must remain in a guard station, they are free to walk around the area of Theo Lacy they are assigned to monitor." (W. Lapinski Decl. ¶ 5.) Deputies might also be assigned to monitor inmates outside of the facility such as in a hospital or the Community Works Program Unit. (W. Lapinski Decl. ¶ 7.) In the alternative, a deputy in Theo Lacy might not monitor inmates at all. (W. Lapinski Decl. ¶ 6.) Instead, a deputy might classify inmates, screen visitors, work in Main Control, Immigration Customs, or the Enforcement Unit. (W. Lapinski Decl. ¶ 6.) Many of these positions require deputies to work in office-style cubicles and not with inmates. (W. Lapinski Decl. ¶ 6.) In contrast, deputies assigned to Musick might have different responsibilities because it is a lower-level security facility. (R. Mena Decl. ¶ 5.) Finally, a deputy assigned to the courts might be placed as a detention deputy, a bailiff, or a runner, all of which have materially different responsibilities. (M. Hiller Decl. ¶ 3.) As Lieutenant Hiller explains, "Detention Deputies are responsible for care and custody of inmates

---

**2.** As the OCSD website explains, deputies can be assigned to any number of units, including Air Support, Bicycle Patrol, the Canine Unit, Commercial Traffic Enforcement, Corrections, Harbor Patrol, Motorcycle Patrol, Mounted Enforcement, Special Weapons and Tactics, Gang Enforcement, Narcotics, Special Operations, Sexual Assault Felony Enforcement, County Wide Law Enforcement Unsolved Element, Sex Offender Notification and Registration Unit, County of Orange Boiler Room, Fraud & Check Detail, Homicide Detail, or Fúgitive/Warrants

Detail. Orange County Sheriff's Department Website, www.ocsd.org/join_ocsd/deputy_assignments/, last accessed December 18, 2009. *See also* Nighswonger Decl. at ¶ 8.

**3.** Some deputies have worked multiple assignments.

**4.** Due to budgetary constraints, the Central Women's Jail is not currently in operation. (Nighswonger Decl. ¶ 6.)

who come to the CJC for court appearances and also for making sure that the inmates appear in the appropriate court for their scheduled appearance. The Bailiffs are assigned to courtrooms and are usually assigned to a particular judge. Runners are assigned to do a variety of activities throughout the courthouse, such as escorting inmates to courtrooms, filling in for Bailiffs and Detention Deputies who are sick or on vacation, and otherwise filling in where needed on any particular day." (M. Hiller Decl. ¶ 3.)

The Field Operations & Investigations Command is divided into four divisions, including Investigations, Patrol Operations, Homeland Security, and Airport Operations. (D. Nighswonger Decl. ¶ 5.) This Command provides police patrol services to contract cities and unincorporated areas within the County, including parks, beaches, coastline areas and harbors. (D. Nighswonger Decl. ¶ 7.) Additionally, this Command is responsible for law enforcement and security at John Wayne Airport and the Orange County Transit Authority and its facilities. (D. Nighswonger Decl. ¶ 7.) This Command also provides investigative services for crimes committed within OCSD's jurisdiction. (D. Nighswonger Decl. ¶ 7.) The manner in which deputies assigned to this command perform their job duties appears to depend on their work location, environment, and the way in which the facility is operated. For example, many more deputies are assigned to South Patrol Operations than North Patrol Operations, which affects the time it might take a deputy to check out patrol vehicles and equipment. (W. Griffin Decl. ¶ 9.) South Patrol polices primarily contract cities and unincorporated areas of the southern part of the County that are geographically closer to one another than the primarily unincorporated areas in North Patrol. (D. Nighswonger Decl. ¶ 8.) Since South Patrol polices contract cities, deputies assigned to this unit are also responsible for traffic enforcement and learning local municipal laws while North Patrol deputies have no such responsibility. (D. Nighswonger Decl. ¶¶ 8–9.) Stanton differs from North Patrol and South Patrol in that it is a higher crime area, which requires deputies assigned to that station to write more reports. (J. Passalaqua Decl. ¶ 13.) In contrast, North Patrol "does not generally generate the number of calls for service that other patrol bureaus do, such as Stanton Police Services or San Clemente Police Services," so Deputies assigned to this location might have more "down time." (T. Gallivan Decl. ¶ 8.) Deputies who are assigned to John Wayne Airport ("JWA") spend a significant portion of their shift on foot patrol through the terminals of the airport. (M. Mullen Decl. ¶ 5.) JWA also uses Sheriff Security Officers ("SSO") to assist and supplement the duties of deputies. (M. Mullen Decl. ¶ 5.) SSOs and deputies work extensively with one another responding to calls, and SSOs tend to take on a significant portion of the deputies' report writing responsibilities. (M. Mullen Decl. ¶ 5.) In contrast, deputies assigned to the Harbor Patrol/Marine Operations Bureau provide around-the-clock law enforcement, marine firefighting and search/rescue services along the Orange County Coastline and to three major harbors including Newport Beach, Sunset–Huntington and Dana Point. (M. Long Decl. ¶ 2.) Thus, even though a deputy may be assigned to patrol, his or her actual job duties may vary widely between specific assignments.

Finally, the Transportation Division is responsible for transporting inmates to various courts, hospitals and jails within the County and throughout the State of California. (S. Taylor Decl. ¶ 2.) Deputies within the Transportation Division might either be General Deputies or Statewide Deputies. (S. Taylor Decl. ¶ 2.) General Deputies make local trips ("runs") to courts, hospitals and jails within the County. (S. Taylor Decl. ¶¶ 2, 11–12.) Statewide Deputies are responsible for taking inmates from the County's jails to various locations within California, and those trips generally take three days "due to dropping off and picking up inmates at various jails along the way." (S. Taylor Decl. ¶ 4.)

Plaintiffs provided OCSD with supplemental disclosures that outlined each of the Plaintiffs' individual claims. (Meneses Decl., Exs. MMMM–RRRR.) These supplemental disclosures reveal that opt-in Plaintiffs occupy all of the assignments previously described. (*See also* D. Ramos Decl., Ex. F.) The wide variation in Plaintiffs' job duties

and assignments is indicative of the fact that Plaintiffs' pre-shift, post-shift, work taken home and missed meal break claims are not well-suited for collective action treatment.

### 1. Pre–Shift and Post–Shift Activities [5] and Work Taken Home

■ As a preliminary matter, Plaintiffs' general description of required pre-shift and post-shift activities is misleading. The Plaintiffs' supplemental disclosures reveal that some Plaintiffs make claims for as many as thirty different sorts of pre-shift activities and at least twenty-five assorted post-shift activities.[6] (Meneses Decl., Exs. MMMM–RRRR.) More importantly, however, the Plaintiffs' pre-shift and post-shift activity claims and work taken home claims vary both between and within assignments.

As to pre-shift activities, Sample Plaintiffs' testimony differed as to if and when they completed certain pre-shift activities. The testimony also reflected the wide range of responsibilities that deputies in the OCSD might have, both between and within assignments. Deputy Beltran reported that his training officers in patrol instructed him that he needed his vehicle to be inspected before briefing, which is when shifts typically begin. (Senf Decl., Ex. 5, M. Beltran Depo. at 128:20–129:3.) Deputy Carrington testified that in patrol, "each day is different," and whether he located his vehicle pre-shift depended on the day, though he estimated that he typically did this activity once per month. (Meneses Decl., Ex. EEE, B. Carrington Depo. at 76:2–20.) Deputy Lashley testified that in North Operations, it was his personal preference to perform certain activities pre-shift, like preparing his patrol car, but he acknowledged there are deputies who prepare their patrol car after briefing. (Meneses Decl., Ex. FFFFFF, G. Lashley Depo. at 97:24–98:8.) Deputy Brown testified that while he was assigned to patrol, he had to arrive at work early to don his uniform, but other than assorted pre-shift activities completed during his training period, he does not make pre-shift claims for time when he was assigned to patrol. (Meneses Decl., Ex. AAA, T. Brown Depo. at 87:17–88:8.)

Deputy Edralin testified that he gets to work at the jails just five minutes early and does not make claims for pre-shift work above donning his uniform. (Meneses Decl., Ex. LLL, D. Edralin Depo. at 31:10–24.) Yet Deputy Arredondo testified that in the jails he had to check his mailbox prior to the start of his shift and that this was expected. (Meneses Decl., Ex. VV, E. Arredondo Depo. at 50:11–51:2.) Deputy Saldivar testified that when he worked as a prowler in the jails, he got to work ten minutes early, got dressed, and headed up to location. (Senf Decl., Ex. 19, Depo. M. Saldivar at 38:4–9.) Deputy White testified that he had to get to the jails early to make sure the area was prepared for inmates and felt pressured to get there early. (Senf Decl., Ex. 24, P. White Depo. at 38:13–39:11.) As for other assignments, Deputy Garcia acknowledged that while he is claiming time for checking the court calendar, courtroom mail, and checking in with the holding tank pre-shift, he was not required to do those activities pre-shift. (Meneses Decl., Ex. OOOOO, M. Garcia Depo. at 71:12–72:17, 95:20–96:19.) Deputy Conway testified that he is making claims for pre-shift patrol activities but does not make claims for his time in transportation. (Meneses Decl., Ex. HHH, T. Conway Depo. at 14:15–21.) These sorts of variations convince the Court that determining whether and when Plaintiffs worked off-the-clock with respect to pre-shift activities will be an inherently individualized inquiry.

---

**5.** The Court does not include donning and doffing uniforms and protective gear within pre-shift and post-shift activities.

**6.** These activities include, but are not limited to, logging in and out of computers, checking email, checking mailboxes, booking evidence, checking equipment in and out, reading training materials, checking patrol vehicles in and out, checking hot sheets, meeting with supervisors, checking for subpoenas, preparing for court, checking pagers, loading patrol vehicles with equipment, checking and responding to phone calls, preparing reports, stocking up on supplies, inspecting patrol vehicles, informal briefings with other deputies, walking time, and preparing reports. (Plaintiffs' third through tenth supplemental disclosures attached to Meneses Decl., Exs. MMMM to RRRR.).

Deputy testimony also varied as to post-shift activities. Deputy Brown testified that he has no post-shift claims for his time at Theo Lacy. (Meneses Decl., Ex. AAA, T. Brown Depo. at 81:15–23; 106:22–107:6.) Deputy Hale testified that the only post-shift activity that he had to perform at Theo Lacy was doffing his uniform. (Meneses Decl., Ex. SSS, M. Hale Depo. at 91:6–13, 92:1–5.) In contrast, Deputy Jensen testified that he is making claims for walking to his locker, changing out, and walking to his car post-shift, but he does not make post-shift claims for his time at North Operations. (Meneses Decl., Ex. WWW, Depo. J. Jensen at 54:16–24, 97:4–11.) Deputy Soltelo stated that on patrol at Laguna Niguel, sometimes he spends "five minutes, sometimes nothing. Sometimes 20, 25 minutes. It just depends on whether we have evidence to book or we had a late call or something." (Meneses Decl., Ex. LLLL, M. Soltelo Depo. at 78:13–25.) Deputy Frese testified that he could not identify instances of when he had been on patrol where he worked 15–20 minutes of post-shift overtime and did not put in for it. (Senf. Decl., Ex. 10, P. Frese Depo. at 50:5–11.) Deputy Arredondo stated that when he stayed over to write reports, he requested overtime " '[c]ause we're out in the field most of the time, and the reports—we're out in the field and the sarge will tell us to put in for overtime for those," (Meneses Decl., Ex. VV, E. Arredondo Depo. at 155:2–11), yet Plaintiffs' supplemental disclosures reveal that other deputies make post-shift or work taken home claims for writing reports, (*e.g.*, Meneses Decl., Ex. MMMM at 4).

These sorts of discrepancies are also born out in Plaintiffs' supplemental disclosures. For example, Deputy Asuncion, who is a Deputy II assigned to Patrol, makes claims for thirty-five types of pre-shift activities and twenty-five types of post-shift activities. (Meneses Decl., Ex. QQQQ at 2–3.) Deputy Moldenhauer, another patrol deputy, makes claims only for donning and doffing his uni-

form. (Meneses Decl., Ex. OOOO at 38.) A third patrol deputy, Deputy Brown, makes claims for ten different sorts of pre-shift activities, but has no claims for post-shift activities. (Meneses Decl., Ex. QQQQ at 5.) Deputy Tauzin, assigned to transportation, makes claims for just two pre-shift activities and no post-shift activities. (Meneses Decl., Ex. MMMM at 35.) Deputy Haire from transportation does not make claims for any pre-shift or post-shift activities except donning and doffing, (Meneses Decl., Ex. MMMM at 17), but transportation Deputy Jacobs makes claims for sixteen pre-shift activities and one post-shift activity, (Meneses Decl., Ex. MMMM at 18.). In contrast, Deputy Becerra, who is also assigned to transportation, makes claims for twenty-three types of pre-shift activities and has no claim for post-shift activities. (Meneses Decl., Ex. MMMM at 1.) Deputy Jenkins makes claims for twenty-eight kinds of pre-shift activities and eighteen kinds of post-shift activities for his time in corrections. (Meneses Decl., Ex. MMMM at 18.) Yet Deputy Lizardi, another corrections deputy, only makes claims for donning and doffing his uniform. (Meneses Decl., Ex. QQQQ at 33.) Deputy Hack makes claims for six types of pre-shift activities and six post-shift activities for his time in corrections. (Meneses Decl., Ex. MMMM at 16.) Deputy Decker, assigned to court services, makes pre-shift claims but no post-shift claims. (Meneses Decl., Ex. QQQQ at 14.) Yet Deputy Guerror makes three pre-shift claims and one post-shift claim for his time in court operations. (Meneses Decl., Ex. MMMM at 16.) This sort of variation among the claimants persuades the Court that Plaintiffs' factual and employment settings differ to the extent that finding a "representative" sample of claimants would be nearly impossible. The variation in claims would result in substantial underpayment or overpayment of certain claimants' claims.[7]

---

7. Plaintiffs have proposed a bifurcated trial plan in which "core" liability issues are tried in Phase I and in Phase II, damages issues are sent to a special master or magistrate for calculation. Were Plaintiffs similarly situated in terms of the pre-shift and post-shift activities and work taken home claims and their general overtime experi-

ences, generalizing from witness testimony would be sensible. Here, however, the claims are simply too varied, and the overtime claimed is time not regularly worked by even a majority of Plaintiffs. If Plaintiffs were to proceed collectively, OCSD would be deprived of a meaningful

Plaintiffs have also hardly attempted to address whether they are similarly situated as to their claims of work taken home. Instead, they rely on their assertion that OCSD has a policy of requiring Plaintiffs to take work home and not compensating for it. As is addressed, *infra*, the record does not reflect such a policy. Moreover, from what the Court can discern, Plaintiffs' claims of uncompensated work taken home are individualized. As reflected in Plaintiffs' supplemental disclosures, Plaintiffs' "other" claims vary from assignment to assignment and individual to individual. Deputy Flaming of corrections makes just one "other" claim, yet Deputy Flores from corrections/SWAT makes six, and Deputy Swaim makes none. (Meneses Decl., Ex. QQQQ at 17–18; Meneses Decl., Ex. NNNN at 42.) Deputy Darnell on Patrol makes claims for seven other activities, yet Deputy Samuels from patrol makes a claim for just one. (Meneses Decl., Ex. RRRR at 3, 12.) Deputy Mendoza makes nine claims for his time in court operations, yet Deputy Milanowski makes just two for his court operations assignment. (Meneses Decl., Ex. NNNN at 30.) Like Plaintiffs' pre-shift and post-shift claims, Plaintiffs' work taken home or "other" claims are simply too diverse to warrant collective treatment, especially when these activities involve time not regularly worked by any member of the class.

Furthermore, the County's expert economist, Dr. Elaine Reardon, has provided persuasive statistical analysis that indicates Plaintiffs are not similarly situated with respect to pre-shift and post-shift activities and work taken home.[8] Dr. Reardon randomly sampled 30 of the Sample Plaintiffs' depositions[9] and evaluated Plaintiffs' supplemental disclosures. (E. Reardon Decl. ¶¶ 9–11.) She found that though, on average, Plaintiffs assert approximately 27.6 claims, the actual range is from zero claims to 80, with a standard deviation of 18.5. (E. Reardon Decl. ¶ 11.) Dr. Reardon determined that there are statistically significant differences between the numbers of claims deputies are making based on their assignment. (E. Reardon Decl. ¶ 14.) Additionally, Dr. Reardon concluded that there is wide variability with respect to types of claims, and thus wide variation between the experiences of individual deputies, even within assignments. (E. Reardon Decl. ¶ 15.)[10] Dr. Reardon did "not see homogenous groups, even after the data are divided by assignment: the wide variation present overall is evident in the subgroups as well." (E. Reardon Decl. ¶ 15.) Dr. Reardon's analysis revealed that deputies report pre-shift activities ranging from three minutes to 99 minutes. (E. Reardon Decl. ¶¶ 21, 25.) Though the mean was 23.5 minutes for pre-shift activities, it could not capture the "very different experiences of the deputies" because the standard deviation was 22.1 minutes. (E. Reardon Decl. ¶¶ 21.) As to post-shift activities, Dr. Reardon noted that the average amount of time is 27.2 minutes of uncompensated activity, but the standard deviation was 37.3 minutes. (E. Reardon Decl. ¶ 25.) The data varied widely, even within assignments. For example, "[t]he data for post-shift activities in Other

opportunity to cross examine the vast majority of the opt-in Plaintiffs concerning time worked.

8. Plaintiffs object and move to strike Dr. Reardon's expert declaration on the grounds that she is a previously undisclosed expert whose declaration they have not had sufficient time to rebut. Federal Rule of Civil Procedure 26(a)(2) requires parties to disclose experts by court-established deadlines. Though Dr. Reardon was not disclosed prior to the filing of this motion, the motion was filed prior to the Court's stated deadline for expert disclosure. Moreover, discovery in this case has been ongoing for years, and Defendants specifically mentioned expert involvement in the case during a status conference before the Court. (Meneses Supp. Decl, Ex. BBBBBBB at 8:1–21.) Considering the length of time that has been allotted for discovery in this case and that the parties have previously discussed expert analysis, the Court finds it difficult to believe that Plaintiffs were surprised by Dr. Reardon's declaration. (*See also* Supp. Decl. B. Walter at ¶¶ 2–6.) Accordingly, Plaintiffs' objection is OVERRULED and motion to strike Dr. Reardon's declaration is DENIED.

9. Dr. Reardon analyzed 10 randomly-selected depositions each from patrol deputies, jails/corrections and specialized assignment. (Decl. Reardon ¶¶ 9–10, 16.)

10. Dr. Reardon divided the deputies into patrol, jails, transportation, court and "other assignments" for the purposes of her subgroup analyses.

Assignments ranges particularly wide, from a minimum of .4 minutes per shift to a maximum of 150. A deputy at the 75th percentile of the distribution reports over 27 times more uncompensated post-shift activity than a deputy at the 25th percentile." (E. Reardon Decl. ¶ 26.) Dr. Reardon reported that the "estimates do not suggest a commonality of experience nor do they suggest that using the mean to characterize the deponents' experience is a useful method for extrapolation to deputies outside the sample." (Reardon Decl. ¶ 25.); see also Proctor, 250 F.R.D. at 283 (noting that wide variation in amounts of time spent working off-the-clock, among other reasons, made action unsuitable for collective treatment).

Plaintiffs rely on two unpublished federal California cases for the proposition that disparities in the types of activities alleged or the time spent on them are immaterial when determining whether Plaintiffs are similarly situated: *Valladon v. City of Oakland*, Case No. C 06–07478–SI, 2009 WL 2591346 (N.D.Cal. August 21, 2009) and *Los Angeles Police Protective League v. City of Los Angeles* ("*LAPPL*"), Case No. CV–06–6390–VBF(MANx). In *LAPPL*, the court, referring to the issue as a "close" question, refused to decertify a class of police officers because Plaintiffs all had "the same job duties and [were] required to don and doff uniforms and protective gear … Plaintiffs and opt-in class members [were] all subject to one general management policy, namely, that time spent donning, doffing, and performing associated activities [was] not compensated by the LAPD." *LAPPL*, CV 06–6390–VBF(MANx), at *4. The court explicitly distinguished cases in which plaintiffs were "subject to different implementations of company policies by various supervisors in numerous offices or store locations." *Id.* In

*Valladon*, the court refused to decertify the class where the plaintiffs had cited evidence suggesting that they were subjected to common policies and practices and therefore worked under similar circumstances. *Valladon*, 2009 WL 2591346, at *7.

This case is unlike *LAPPL*, which only involved donning and doffing claims of patrol or traffic enforcement officers, because Plaintiffs here have a wide range of responsibilities, are assigned to many different assignments ranging from the jails to patrol to the courts to transportation and other specialized assignments, and, most importantly, Plaintiffs make claims for a host of activities beyond donning and doffing. The Court agrees that Plaintiffs, like the officers in *LAPPL*, are similarly situated with respect to their donning and doffing claims and that they have provided substantial evidence of a common policy of not reimbursing for those activities, but Plaintiffs' remaining claims appear to depend heavily on their job assignment and personal habit. *Valladon* is also distinguishable from this case because the plaintiffs had actually identified common policies and practices regarding time worked and defendant had failed to describe unique defenses, but here, as explained *infra*, Plaintiffs have not provided substantial representative evidence of such a policy.[11] *Valladon*, 2009 WL 2591346, at *7. The magnitude of variation in the Plaintiffs' claims in conjunction with Dr. Reardon's analyses convinces the Court that Plaintiffs' pre-shift, post-shift, and work taken home claims arise out of very different factual and employment circumstances that will not be amenable to generalized evidence. Dealing with these claims in a single trial will not merely result in confusion and inefficiency, it will inject chaos into the fact-finding process.

---

11. Additionally, Plaintiffs in *Valladon* were divided into twenty-one sub-groups. *Valladon v. City of Oakland*, Case No. C 06–07478–SI, 2009 WL 2160450, at *1 (N.D.Cal. July 19, 2009). The Court, respectfully, declines to follow suit. Where Plaintiffs would need to be divided into so many classes to group similarly situated parties, the case is not appropriate for collective treatment. Though Plaintiffs here make a last-ditch effort to ask the Court to divide claimants into three sub-classes, they provide no authority to suggest that this is a necessary step. *See*

*Anderson*, 488 F.3d at 954 n. 2 (declining to review district court's decision not to create subclasses where, "although plaintiffs suggested to the district court the creation of subclasses as a way to effectively manage the collective action, they failed to argue or cite legal authority for the proposition that taking such action was compulsory.") More importantly, however, the Court does not agree that this division would avoid the level of chaos and confusion that will result from hearing these claims together.

## 2. Meal Breaks

■ Great variation also extends to meal breaks, or as they are known in the Department, Code 7's. The Plaintiffs' various supervisors elucidated how a deputy's Code 7 experience might differ depending on the assignment and even the particular day. For example, Lieutenant Hiller explained that deputies assigned to the courts get an hour and a half for lunch no matter what assignment they are working. (M. Hiller Decl. ¶ 6.) However, scheduling of lunch breaks "differs depending on whether you are a Bailiff, Detention Deputy or Runner." (M. Hiller Decl. ¶ 6.) In contrast, deputies assigned to patrol and jails have more discretion as to scheduling lunch breaks. For example, in the contract city of San Juan Capistrano, deputies "are responsible for taking a 'Code 7' ... to be determined in their discretion, during the course of their scheduled shift." (D. Dwyer Decl. ¶ 11.) Deputies assigned to the Harbor Patrol are also given discretion as to when they will take their lunch break, and, according to one supervisor, "there is enough down time during the course of any typical" harbor patrol shift to take a meal break. (M. Long Decl. ¶ 8); *see also* (Meneses Decl., Ex. JJJ, J. Davis Depo. at 11:15–25 (Deputy Davis not making claim for missed Code 7 in harbor patrol.)) Similarly, deputies at Theo Lacy are "given the discretion to find a period of time during their 12.5–hour shift in which they can take their meal breaks." (W. Lapinski Decl. ¶ 11.)

Sample Plaintiffs' testimony varied as to if, when, where and how they could take their meal breaks. For example, Sample Plaintiff Timothy Brown testified that he missed almost all of his meal breaks when he was assigned to the Theo Lacy jail, but he was always able to take a meal break when assigned to Mission Viejo patrol because "[w]e have time on patrol for meal breaks. We make time." (Meneses Decl., Ex. AAA, T. Brown Depo. at 55:12–57:10.) Sample Plaintiff Adewale Olujuku testified that he never had full-length meal breaks while assigned to the same Mission Viejo patrol assignment as Deputy Brown. (Meneses Decl., Ex. EEEE, A. Olujuku Depo. at 105:10–106:11.) In con-trast, Deputy Davis testified that in harbor patrol, he does not miss meals. (Meneses Decl., Ex. JJJ, J. Davis Depo. at 11:15–25.) Deputy Feely testified that when he was in patrol and missed lunch, his training officer instructed him to put in for overtime. (Senf Decl., Ex. 9, T. Feely Depo. at 69:14–18.) In contrast, when he was an administrative deputy, he did not put in for overtime when he missed lunch because one of his supervisors stressed, noting the flexibility of the administrative deputy schedule, that it would all come out in the wash. (Senf Decl., Ex. 9, T. Feely Depo. at 69:19–70:9.) On these occasions, he would try to leave early that day, and "if [he] didn't and the sergeant [knew] that, he would let [him] leave early on a different day." (Senf Decl., Ex. 9, T. Feely Depo. at 69:14–70:14.)

Deputy Brown also acknowledged that some deputies at Theo Lacy take time to work out, and "one might consider that a meal break." (Meneses Decl., Ex. AAA, T. Brown Depo. at 82:22–83:2.) In fact, Deputy Reyes said that he uses his meal time at Theo Lacy to work out in the gym and only makes claims for when he did not work out, and further, "some deputies take advantage of [the meal periods] and take too long, like, for instance, when they go to work out ... Some deputies will spend two, two and a half hours down there." (Meneses Decl., Ex. IIII, A. Reyes Depo. at 52:24–53:3, 214:4–216:10.) To wit, Deputy Carmona, though he is making claims for missed Code 7s, admitted that "[i]f one is going to take the amount of time that I used to workout and substitute my lunch break with that," then he probably cannot make a claim for missed meals. (Meneses Decl., Ex. DDD, W. Carmona Depo. at 70:8–22.) Yet Deputy Feely testified that it's "fairly rare to get a half hour break inside of the jail." (Senf Decl., Ex. 9, T. Feely Depo. at 79:9–14.) Deputy Brady reported that while he feels he is not relieved for lunch, there are probably assignments where deputies are getting completely relieved. (Meneses Decl., Ex. YY, A. Brady Depo at 175:19–23.) And Deputy White testified that he did not miss meal periods at CJC but did at Theo Lacy and is not making a missed meal break claim for his court assignment. (Senf Decl., Ex. 24, P. White

Depo. at 40:16–23, 71:3–24.) Deputy Elmore is also not making claims for missed meal breaks at Lamoreaux Justice Center. (Meneses Decl., Ex. MMM, M. Elmore Depo. at 91:9–11.)

Dr. Reardon's analysis of the 30 randomly selected depositions supports the view that Plaintiffs are not similarly situated with respect to their meal breaks. The 30 randomly selected Plaintiffs testified to missing anywhere from zero to as many as 5.76 meal breaks per week, with a plus or minus range of 63%. (Reardon Decl. at ¶ 17.) Variations with respect to meal breaks were found to exist both across assignments and within assignments. (Reardon Decl. ¶ 18.) Patrol deputies alleged an average of 2.4 missed meals per week while jail deputies averaged 3.2 missed meals per week. (Reardon Decl. at ¶ 18.) However, deputies within the Theo Lacy jail, for example, alleged missing from zero to 4.4 meal breaks per week and deputies within Lake Forest patrol alleged missing anywhere from one to four meal breaks per week. (Reardon Decl. ¶ 19.) Dr. Reardon found that "the average number of missed meals is not a good measure for inferring individual experience because the variation is so large." (Reardon Decl. ¶ 17.)

As is no doubt evident, the deputies' experiences concerning their meal breaks are diverse. In truth, whether Plaintiffs missed a meal break and reported it varies from assignment to assignment and from deputy to deputy. Attempting to generalize a deputy's experience using a representative sample would be a highly inaccurate method of determining the validity of Plaintiffs' claims. It is senseless to proceed as a collective action when Plaintiffs' experiences regarding missed meals vary from day to day, and from individual to individual. Even more trou-

bling is that OCSD will not have an opportunity to meaningfully cross examine opt-in Plaintiffs concerning their meal breaks, which will produce unfairness on both sides.

### 3. OCSD Policy

■ To proceed as a collective action, Plaintiffs must present substantial evidence of a common policy, plan, or scheme of permitting or requiring uncompensated off-the-clock work. "An allegation of an 'overarching' policy is generally insufficient; plaintiffs must produce 'substantial evidence' of a 'single decision, policy or plan.'" *Micron*, 2005 WL 5336571, at *2. Plaintiffs allege that their claims arise from a single decision, policy or plan to illegally train, educate and discourage deputies from reporting time spent donning and doffing, performing various pre-shift and post-shift overtime activities, meals missed and work taken home. The record before the Court, however, shows otherwise. If Plaintiffs were denied or discouraged from reporting overtime pay, it occurred in many different ways, by many different managers, at different times, and in different assignments and locations. There was no single, uniform policy not to pay overtime.

OCSD's written policies, memorialized in numerous documents throughout the OCSD, explicitly state that employees are to receive compensation for all hours worked, regular or overtime. (Def. Mot. Decertification at 3:9–21.) In fact, OCSD payroll manager, Diane Ramos, stated that payroll records revealed that all but two of the Sample Plaintiffs have been paid for some amount of overtime in the last five years. (Ramos Decl. ¶ 6.) If OCSD had a policy with respect to overtime, the policy was to pay the deputies for it.[12]

---

12. Plaintiffs' suggestion that training to do off-the-clock work and not reporting it begins in the Academy is odd in light of the Academy's broad focus and apparent separation from the Department. (Meneses Decl., Ex. YYYYYY, B. Newmyer Depo. at 22–23.) As noted, the Academy trains police officers from many different departments, not just the OCSD. (*Id.*) The Academy curriculum is regulated by a state agency. (Meneses Decl., Ex. YYYYYY, B. Newmyer Depo. at 23.) Trainees also receive college credit for time spent in the Academy, which is quite different than their experience as deputies. (*Id.* at

166; Meneses Decl., Ex. BBBBBB, V. Johnson Depo. at 16:1–17:9.) Moreover, Deputy Lizardi acknowledged that in the Academy, deputies are essentially students. (Meneses Decl., Ex. HHHHHH at 25:15–23.) Though recruits are given time sheets, it is the supervisors who are responsible for filling them out, not the recruits. (Meneses Decl., Ex. YYYYYY, B. Newmyer Depo. at 35.) Plaintiffs admit that deputies do not even learn to fill out time sheets until after they have graduated from the Academy. (Pl.

The deputies' own deposition testimony falls far short of establishing that OCSD had a single, uniform policy of permitting or requiring uncompensated off-the-clock work. Deputy Davis reported that "there is a time that every deputy lives with, and he decides what he gets signed up for and not get signed up for." (Meneses Decl., Ex. JJJ, J. Davis Depo. at 66:15–19.) Deputy Davis also suggested that reporting overtime might depend on the deputy's seniority. (Meneses Decl., Ex. JJJ, J. Davis. Depo. at 66:13–23.) Deputy Jensen testified that whether a Plaintiff reported overtime depended on the deputy's assignment. (Meneses Decl., Ex. WWW, J. Jensen Depo. at 123:20–124:4.) Specifically, Deputy Jensen explained that he believed jail sergeants would not sign him in for overtime, but on patrol he perceived overtime work to be "a one-case-by-one-case situation," and "in patrol pretty much if you signed in for overtime, you are going to get it." (Menses Decl., Ex. WWW, Depo. J. Jensen at 123:22–124:10.) Deputy Alvarez could not think of a reason why he had not reported certain overtime activities. (Meneses Decl., Ex. SS, A. Alvarez Depo. at 87:4–21.) Deputy Johnson stated that "[a] lot of it depended on who happened to be your supervisors." (Meneses Decl., Ex. ZZZ, V. Johnson Depo. at 11:16–17.) Deputy Jansen could not identify any supervisors who had instructed him that he should not report overtime, (Senf. Decl., Ex. 13, C. Jansen Depo. at 66:12–67:2), but Deputy Frese testified that five years ago he signed in for fifteen minutes, which was not well received by his supervisor, who eventually whited it out. (Senf. Decl, Ex. 10, P. Frese Depo. at 66:16–68:1.) Deputy Brady reported that an "unwritten rule" of not reporting for small amounts of overtime got passed down through "word of mouth through peer to peer pressure" and that sometimes supervisors actually "make note of it or point it out." (Meneses Decl., Ex. YY, A. Brady Depo. at 69:3–20.) Deputy Carrington also reported that he feels pressure to relieve his fellow deputies quickly so that he does not let them down, which he feels contributes to an unwritten rule to perform pre-shift work, but he professed that he has not been instructed

by supervisors to perform work off-the-clock. (Meneses Decl., Ex. EEE, B. Carrington Depo. at 92:6–93:5; 140:9–13.) Deputy Epley reported feeling "pressure sometimes" from supervisors not to report overtime, (Menses Decl., Ex. NNN, B. Epley Depo. at 174:16–18), yet many Sample Plaintiffs testified that they have not felt pressured or coerced to not request overtime, e.g., (Meneses Decl., Ex. TTTTT, M. Hale Depo. at 120:11–121:5; Meneses Decl., Ex. KKKKK, D. Edralin Depo. at 84:15–17; Meneses Decl., Ex. HHHHHH, S. Lizardi Depo. at 117:22–24.) Deputies Flynn and Conway stated that they have been comfortable requesting overtime for 15 minutes, (Meneses Decl., Ex. HHH, T. Conway Depo. at 90:5–21 and Ex. NNNNN, R. Flynn Depo. at 73:8–74:5), and Deputy Sramek has put in for overtime of 15–30 minutes and was only criticized for not telling his supervisors about the overtime earlier, but not for requesting the overtime per se, (Senf. Decl., Ex. 21, T. Sramek Depo. at 74:3–17.).

OCSD also presented evidence that many of the Sample Plaintiffs based their decision on whether to request overtime on the identity of the particular supervisor. For instance, Plaintiff Deputy Vicki Johnson, when asked to explain why she feels OCSD discourages overtime, testified: "First of all, I probably misspoke saying the department as a whole. That's not true. I would say supervisors." (Meneses Decl., Ex. ZZZ, V. Johnson Depo. at 11:5–11.) Deputy Johnson also testified that certain supervisors made her feel "petty" when she requested a small amount of overtime, though "some supervisors were fine with it. A lot depended on who happened to be your supervisors." (Meneses Decl., Ex. ZZZ, V. Johnson Depo. at 11:5–11.) Deputy Lashley testified that supervisors did not "universally" disapprove of overtime. (Meneses Decl., Ex. BBBB, G. Lashley Depo. at 52:2–5.) Instead, Deputy Lashley testified that while some supervisors discouraged reporting small amounts of overtime, "[t]here are many Sergeants that just say, hey, you feel like you deserve the overtime, then sign in for it." (Meneses Decl., Ex. BBBB, G. Lashley Depo. 51:14–52:5;

Opp. at 4:7–9.; Senf Decl., Ex. 30, D. Nighswonger Depo. at 40:2–21.)

102:15–103:13.) Similarly, Deputy Garduno reported that she had experienced problems with reporting overtime under Sergeants Lagaret and Mansfield, but she did not have any problems reporting overtime under Sergeant Rios. (Meneses Decl., Ex. PPP, G. Garduno Depo. 48:11–51:5.) Deputy Pendry reported that overtime reporting of amounts even up to an hour-and-a-half would be frowned upon in Statewide, (Senf. Decl., Ex. 18, E. Pendry Depo. at 62:6–20), yet Deputy Beltran reported that he would always sign up for this sort of overtime, but he would not sign up if it was 25–30 minutes of overtime, (Senf Decl., Ex. 5, M. Beltran Depo. at 19:15–20:10.). Deputy Pahlavan described an incident in which he had to stay late and informed his supervisor, who insisted that he report the overtime despite his own protestations that it wasn't "a big deal." (Meneses Decl., Ex. FFFF, Depo. A. Pahlavan at 165:14–25.) Simply stated, the record before the Court does not establish a single, uniform OCSD policy designed to discourage reporting certain amounts of overtime. In fact, deputy experiences vary from assignment to assignment, from supervisor to supervisor, and from individual to individual.

### b. Defenses

■ The second factor in the analysis of whether this action should proceed as a collective action is the available defenses that need to be litigated on an individual basis. Defendants have several such defenses here, including: whether a particular deputy worked overtime; whether and why a particular deputy may have under-reported work time; whether supervisors were aware of alleged off-the-clock work; whether a particular deputy violated Defendants' policies for accurately recording time; whether the particular activities were compensable; and whether the time spent on these activities was *de minimus*. As the court in *Micron* noted, these sorts of "defenses ... must, by their nature, be individualized." *Smith*, 2007 WL 2385131, at *8; *accord Basco v. Wal-Mart Stores, Inc.*, No. Civ. A 00–3184, 2004 WL 1497709, at *8 (E.D.La. July 2, 2004).

Plaintiffs will need to demonstrate that OCSD management either had constructive or actual knowledge that Plaintiffs were working off-the-clock without pay. *Pforr v. Food Lion, Inc.*, 851 F.2d 106, 109 (4th Cir. 1988); *Maciel v. City of Los Angeles*, 569 F.Supp.2d 1038, 1043 (C.D.Cal.2008). According to the Ninth Circuit,

> an employer who knows or should have known that an employee is or was working overtime must comply with the provisions of the [FLSA]. An employer who is armed with this knowledge cannot stand idly by and allow an employee to perform overtime work without proper compensation, even if the employee does not make a claim for overtime compensation. However, where an employer has no knowledge that an employee is engaging in overtime work and that employee fails to notify the employer or deliberately prevents the employer from acquiring knowledge of the overtime work, the employer's failure to pay for the overtime hours is not a violation of the [FLSA].

*Forrester v. Roth's I.G.A. Foodliner, Inc.*, 646 F.2d 413, 414 (9th Cir.1981). "It is not enough for a plaintiff to establish his employer's knowledge of a few incidents of off-the-clock work" for several years' worth of claims. *Pforr*, 851 F.2d at 109. To rebut Plaintiffs' allegations of knowledge, Defendants will have to introduce evidence that is inherently individualized. *Hinojos v. Home Depot, Inc.*, Case No. 2:06–CV–00108, 2006 WL 3712944, at *3 (D.Nev. Dec.1, 2006).

The Sample Plaintiffs have varying views of whether their supervisors knew they were working off-the-clock. Deputy Anaya testified that his supervisors observed him working off-the-clock, (Meneses Decl., Ex. TT, J. Anaya Depo. at 75:12–76:21), and Deputy Elmore testified that she never attempted to make her supervisors aware that she was working off-the-clock, her supervisors never instructed her to work without pay or perform activities off-the-clock, and they never discouraged her from submitting overtime requests, (Meneses Decl., Ex. MMM, M. Elmore Depo. at 90:1–91:3). Deputy Allemand apparently never complained to a supervisor about missing meal breaks but stated that many supervisors discouraged him from reporting overtime, though he could not name

any specific supervisors. (Senf Decl., Ex. 3, J. Allemand Depo. at 84:1–3, 99:16–17.) Deputy Johnson conceded that whether she was discouraged from reporting overtime was dependent on individual supervisors. (Meneses Decl., Ex. ZZZ, V. Johnson Depo. 11:2–17.) Deputy Hamill identified a supervisor whom he alleged knew or "should" know that deputies were working off-the-clock. (Senf Decl., Ex. 12, S. Hamill Depo. at 50:10–18). But Deputy Beltran never attempted to make his supervisors aware that he was performing certain off-the-clock work, for example, talking with district attorneys while at home, yet it is unclear how the supervisors could have learned of that work without his reporting. (Senf. Decl., Ex. 5, M. Beltran Depo. at 47:14–25, 49:2–24.)

Many of the Plaintiffs' supervisors also submitted declarations in which they explained that they were not aware that deputies were performing work off-the-clock. (P. D'Auria Decl. ¶ 11; D. Dwyer Decl. ¶ 9; W. Lapinski Decl. ¶ 15; S. Taylor Decl. ¶ 15; M. Hiller Decl. ¶ 12; J. Passalaqua Decl. ¶ 17; M. Mullen Decl. ¶ 16; T. Gallivan Decl. ¶ 13.) Many of these supervisors also declared that they give deputies "significant discretion to perform their duties and in turn expect that Deputies will not abuse that discretion and will follow Department policies, including reporting all overtime worked." (K. Mansfield Decl. ¶ 10; see also J. Passalaqua Decl. ¶ 17; D. Dwyer Decl. ¶¶ 2, 10–11; P. D'Auria Decl. ¶¶ 9–10, 13; S. Taylor Decl. ¶ 15 ("There are no supervisors on the [Statewide] trip to monitor Code 7s or when the Deputies actually arrive or leave any of the facilities or their hotel rooms.").) In fact, some supervisors do not even work the exact same shifts as the deputies whom they supervise. (D. Dwyer Decl. ¶¶ 4–5.) Given the discretion afforded to deputies, many supervisors declare that they would have no way of knowing that deputies performed work off-the-clock unless it was reported. (K. Mansfield Decl. ¶ 10; J. Passalaqua Decl. ¶ 17; T. Gallivan Decl. ¶ 13; M. Hiller Decl. ¶ 7, 10; D. Dwyer Decl. ¶ 5; P. D'Auria Decl. ¶ 13; W. Lapinski Decl. ¶ 15; S. Taylor Decl. ¶¶ 15–16.)

Notwithstanding the number of supervisors a deputy may have in a single assignment, many deputies will also have multiple supervisors from different divisions by virtue of the fact that they have held multiple assignments during the period in question. Based on the level of discretion that deputies are afforded in carrying out their duties, whether supervisors or the OCSD as a whole had either actual or constructive knowledge that deputies were working off-the-clock is an inherently individualized inquiry. Moreover, Defendants' inability to cross-examine the vast majority of the opt-in Plaintiffs on this issue would be unfairly prejudicial in light of the fact that it appears that supervisors in certain assignments were not aware that Plaintiffs were working off-the-clock. To that end, a collective action would not allow OCSD to meaningfully or fairly challenge Plaintiffs' claims of knowledge. See *Johnson v. Big Lots Stores, Inc.*, 561 F.Supp.2d 567, 586–87 (E.D.La.2008) (decertifying collective action post-trial after proceedings revealed unsuitability of trying claims and issues through representative testimony).

Defendants have also raised the following affirmative defenses: (1) particular supervisors acted in good faith; (2) the off-the-clock activities did not constitute compensable "work;" and, (3) any alleged off-the-clock work or time shaving falls within the *de minimus* exception to the FLSA. Of greatest concern to the Court is the *de minimus* defense. Since Plaintiffs have not provided substantial evidence of a single OCSD policy or practice that violates the FLSA with respect to pre-shift, post-shift, work taken home, and missed meal break claims, the Court finds that proving this defense will be as individualized as the claims are. Under the *de minimus* doctrine, employees are not entitled to compensation for insubstantial periods of time spent working. *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680, 692, 66 S.Ct. 1187, 90 L.Ed. 1515 (1946) ("When the matter in issue concerns only a few seconds or minutes of work beyond the scheduled working hours, such trifles may be disregarded. Split-second absurdities are not justified.... It is only when an employee is required to give up a substantial measure of

his time and effort that compensable working time is involved"); *Singh v. City of New York*, 524 F.3d 361 (2d Cir.2008); *Reich v. Monfort, Inc.*, 144 F.3d 1329 (10th Cir.1998). Courts must evaluate several factors in order to determine whether time spent is substantial or reasonable time. *Frank v. Wilson & Co.*, 172 F.2d 712 (7th Cir.1949). The Ninth Circuit directs courts to consider "(1) the practical administrative difficulty of recording the additional time; (2) the aggregate amount of compensable time; and (3) the regularity of the additional work." *Lindow v. United States*, 738 F.2d 1057, 1062–63 (9th Cir.1984); *see also Ballaris v. Wacker Siltronic Corp.*, 370 F.3d 901, 912 (9th Cir.2004) (20–30 minutes spent donning and doffing uniforms on employer's premises not *de minimus* ); *Reich*, 144 F.3d at 1333–34. Since the Court has determined that Plaintiffs' claims are highly individualized, determining whether and when a particular Plaintiff regularly engaged in additional work and calculating the aggregate amount of time worked is an inherently individualized inquiry. *Smith*, 2007 WL 2385131, at *8; *Basco*, 2004 WL 1497709, at *8.

Defendants have demonstrated that both rebutting Plaintiffs' claims and presenting certain defenses will require searching, deputy-by-deputy review. Attempting to rebut the individual claimants' claims of knowledge and determining whether the time they spent on off-the-clock activities was *de minimis* will necessarily result in individualized inquiry due to the individualized nature of the claims. One would be hard-pressed to imagine how a trial could proceed in any sort of manageable fashion where so many of the claims must be rebutted by individualized evidence. Accordingly, this factor weighs heavily in favor of decertification.

### c. Fairness and Procedural Considerations

█ In evaluating fairness and procedural considerations, the Court must consider the primary objectives of a collective action: (1) to lower costs to the plaintiffs through the pooling of resources; and (2) to limit the controversy to one proceeding which efficiently resolves common issues of law and

fact that arose from the same alleged activity. *Johnson*, 2005 WL 1994286, at *7. However, "the Court must also determine whether it can coherently manage the class in a manner that will not prejudice any party." *Id.* (citation omitted).

Permitting this case to proceed as a collective action is neither efficient nor fair to Defendants or Plaintiffs. Given Plaintiffs' varying factual and employment settings and the lack of substantial evidence that Plaintiffs were subjected to a uniform decision, policy or practice of requiring deputies to perform work off-the-clock and discouraging them from reporting that work, the jury will have to make individualized determinations as to whether the Plaintiffs performed the work claimed and whether the OCSD had either constructive or actual knowledge that Plaintiffs were working off-the-clock. Since many of the Sample Plaintiffs worked in more than one assignment and often worked different shifts during any given assignment during the statutory period, each Plaintiff may have had several supervisors who will be required to testify at trial, and any claims and defenses must be made, explored, and tested on an individualized basis. Proceeding collectively in this case would, in short, be unmanageable, chaotic and counterproductive. *See T-Mobile*, 2007 WL 2385131, at *8.

Plaintiffs contend that this case could be presented via "representative testimony" on "core" issues. In a collective action in which all members are similarly situated, plaintiffs may be permitted to establish their case using representative testimony. Decertifying a collective action is appropriate, however, when a jury trial would consist of a large number of separate mini-trials and would consume significant judicial time and resources. *Reyes v. Texas Ezpawn, L.P.*, Case No. V–03–128, 2007 WL 101808, at *6 (S.D.Tex. Jan.8, 2007). Considering how varied the Plaintiffs' experiences are, it is difficult to understand how one might distinguish between core and peripheral issues. Representative testimony will not accurately capture each Plaintiff's diverse factual circumstances. This will result in some Plaintiffs being prejudiced by underpayment on their claims as well as prejudice to Defendant,

which will overpay some Plaintiffs on their claims. As one court has noted, "a collective action is designed to permit the presentation of evidence regarding certain representative plaintiffs that will serve as evidence for the class as a whole." *Bayles v. Am. Medical Response of Colo., Inc.,* 950 F.Supp. 1053, 1065 (D.Colo.1996). Multiple, individual trials on the merits is the antithesis of a collective action, which is what will occur in this case if it continues collectively. *See Hinojos,* 2006 WL 3712944, at *3. "It is oxymoronic to use such a device in a case where proof regarding each individual plaintiff is required to show liability." *Bayles,* 950 F.Supp. at 1065. Hearing Plaintiffs' pre-shift, post-shift, missed meal break and "other" claims together would not preserve significant judicial resources, it would deplete them, and the substantial confusion that will result weighs heavily in favor of decertification.

After carefully examining the voluminous record including briefs, deposition testimony, declarations and argument, the Court finds that individualized determinations are needed for several of Plaintiffs' off-the-clock claims, which makes collective treatment with respect to pre-shift, post-shift, missed meal break and work taken home claims impractical. *Hinojos,* 2006 WL 3712944, at *3. Like the Plaintiffs in *Lawrence* and *Johnson* whose variations in job duties and assignment made the matter unsuitable for collective action treatment, an OCSD deputy's job responsibilities and overtime reporting depends heavily on his or her assignment and particular supervisor. Though it is true that Plaintiffs need not be identically situated for the purposes of this inquiry, *Grayson v. K Mart Corp.,* 79 F.3d 1086, 1096 (11th Cir. 1996), "the similarities necessary to maintain a collective action under § 216(b) must extend 'beyond the mere facts of job duties and pay provisions,'" *Anderson,* 488 F.3d at 953 (citation omitted). Merely relying on the fact that Plaintiffs are sheriffs' deputies to support collective treatment where Plaintiffs' employment environments and factual circumstances differ significantly depending on their assignment and individual supervisor falls short of demonstrating that Plaintiffs are similarly situated. As one court observed, while "[P]laintiffs' claim that they

were illegally denied overtime pay is ostensibly a common legal nexus giving rise to a common injury, that commonality is illusory because the underlying claims are disparate." *T–Mobile,* 2007 WL 2385131, at *3.

**B. Donning and Doffing**

**a. Factual and Employment Settings**

■ Plaintiffs' factual and employment circumstances are similar with respect to their donning and doffing claims, and Plaintiffs have provided substantial evidence that OCSD policy is to not compensate for those activities. The vast majority of the deposition testimony presented to the Court highlighted that most of the Plaintiffs are required to don their uniforms and protective gear prior to beginning their shifts, in fact, much of Plaintiffs' evidence focused on this particular issue. (*E.g.,* Senf. Decl., Ex. 5, M. Beltran Depo. at 13:3–16; Senf Decl., Ex. 10, P. Frese Depo. at 28:8–25; Senf Decl., Ex. 11, G. Hamchuk Depo. at 25:1–24; Senf Decl., Ex. 13, C. Jansen Depo. at 22:1–24:12.) Captain Board stated that he did not believe fifteen minutes of getting dressed would be compensated. (Senf Decl., Ex. 25, T. Board Depo. at 84:16–85:15.) Department officials confessed that the OCSD does not view donning and doffing uniforms as compensable activity under the FLSA. (Senf. Decl., Ex. 26, S. Carlucci Depo. at 49:1–9; Senf Decl., Ex. 25, T. Board Depo. at 84:16–85:15; Senf Decl., Ex. 27, B. Guidice Depo. at 57:2–58:22.) Supervisory personnel have even observed deputies changing in the locker room. (Senf Decl., Ex. 27, B. Guidice Depo. at 34:2–12.) Finally, though the MOUs indicate that deputies are supposed to be relieved from duty to doff their uniforms, OCSD officials admit that deputies would not be entitled to submit an overtime slip in the event that they were not relieved early to doff their uniforms. (Senf Decl., Ex. 30, D. Nighswonger Depo. at 53:3–11, 55:20–56:2; Senf Decl., Ex. 28, K. Kiddy Depo. at 59:10–60:25.) While OCSD attempts to argue that some Sample Plaintiffs are plain clothes police officers and that the Plaintiffs don and doff different kinds of uniforms depending on assignment, variation in Plaintiffs' dress is not material when nearly all Sample Plaintiff testimony regarding

this issue highlighted that officers are required to be in uniform prior to the start of their shifts and that the OCSD has essentially admitted that its policy is to not compensate deputies for donning and doffing uniforms and protective gear.

### b. Defenses

Defendant does not have unique or individualized defenses with respect to Plaintiffs' donning and doffing claims. As noted, OCSD offers several affirmative defenses, including that certain supervisors acted in good faith, certain activities are not compensable, and certain activities are *de minimus*. Though these defenses are individualized as to Plaintiffs' pre-shift, post-shift, missed meal break and other claims, here, Plaintiffs report a common experience—they must don uniforms and protective gear pre-shift and are not entitled to be compensated, and if they are relieved late, they are not permitted to request overtime for doffing their uniforms. The most effective method of determining liability as to these claims is on a class-wide basis, and there is no defense that must be individually litigated.

### c. Fairness and Procedural Considerations

Plaintiffs' donning and doffing claims are quite similar, and there is substantial evidence that they are the result of an official OCSD policy of not reimbursing for those claims. Proceeding collectively on these claims will prejudice neither the OCSD nor Plaintiffs. In fact, proceeding collectively as to this issue is the most expedient method of resolving these claims. The Court is unable to identify any reason why permitting Plaintiffs to proceed collectively would be contrary to fairness or justice, and rather than being forced to re-litigate the same issue repeatedly, the parties will be able to resolve a common issue in a single proceeding.

## V. CONCLUSION

For the foregoing reasons, OCSD's motion to decertify the collective action is GRANTED IN PART and DENIED IN PART. Named Plaintiff Margaret Reed shall be permitted to proceed on all claims. Remaining pre-shift, post-shift, missed meal break and work taken home claims are DISMISSED WITHOUT PREJUDICE as to opt-in Plaintiffs. Additionally, the Court tolls the statute of limitations for 60 days from the date of this order. With this additional time, Plaintiffs adversely affected by this ruling may have an opportunity to pursue their individual claims.