Barbara JUDKINS, Plaintiff,

v.

SOUTHERNCARE, INC., Defendant.

No. 4:12–cv–00293.

United States District Court,
S.D. Iowa,
Central Division.

Signed Jan. 6, 2015.

Harley C. Erbe, Erbe Law Firm, Des Moines, IA, for Plaintiff.

Lisa Stephenson, Simmons Perrine Moyer & Bergman PLC, Cedar Rapids, IA, Kevin J. Visser, Thomas D. Wolle, Simmons Perrine Moyer & Bergman PLC, Cedar Rapids, IA, for Defendant.

## ORDER

ROBERT W. PRATT, District Judge.

Before the Court is Southerncare, Inc.'s ("Southerncare" or "Defendant") Motion to Decertify the class in this FLSA[1] collective action, filed November 17, 2014 ("Motion"). Clerk's No. 64. Barbara Judkins ("Judkins") filed a timely response on November 20, 2014. Clerk's No. 66. Southerncare replied on December 1, 2014. Clerk's No. 68. The matter is fully submitted.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Southerncare owns and operates hospice centers in approximately fifteen states. *See* Clerk's No. 1–1 ¶ 3. Judkins was employed by Southerncare as a Community Relations Specialist ("CRS") from 2009 to 2012. *Id.* ¶ 5; Clerk's No. 15 at 3. Judkins

---

**1.** The abbreviation "FLSA" used throughout this Order stands for the Fair Labor Standards Act. *See* 29 U.S.C. § 201 *et seq.*

filed this lawsuit on behalf of herself and all 311 CRSs employed by Southerncare in the three years preceding the lawsuit. *See* Clerk's Nos. 1–1 ¶ 7, 11–1 at 4. Judkins alleges that Southerncare improperly classified the CRS position as exempt from the overtime pay provisions of the FLSA, and routinely required employees in the position to work more than forty hours a week. Clerk's No. 1–1 ¶ 13–20. The Court granted Judkin's Motion for Conditional Class Certification on June 24, 2013. *See* Clerk's No. 20. Following that Order, twenty-eight individuals opted in to the lawsuit, and the parties engaged in discovery. *See* Clerk's No. 50 ¶¶ 2–4. Twenty-three of the opt-in Plaintiffs failed to comply with the Court's discovery order and were dismissed from the lawsuit. *See* Clerk's No. 67. Two additional opt-in Plaintiffs were scheduled to attend depositions, but did not appear. *See* Clerk's No. 65. On October 6, 2014, Southerncare filed a Motion to Compel and for Sanctions, requesting that the two Plaintiffs be ordered to attend depositions. *See* Clerk's No. 58. The Court granted the motion on November 19, 2014; the two Plaintiffs were ordered to attend depositions by December 5, 2014, or face sanctions, including dismissal of their claims. *See* Clerk's No. 65. One of the Plaintiffs appeared for a deposition on December 5, 2014, but the other Plaintiff failed to appear. The Plaintiff who failed to appear was, accordingly, dismissed from the case on January 6, 2015. Thus, the case proceeds with Judkins and four opt-in Plaintiffs (collectively "Plaintiffs").

## II. LAW AND ANALYSIS

### A. *Final Certification Standard*

■ To avoid decertification of the conditionally certified class, Plaintiffs must demonstrate that they are similarly situated, which is proved if they " 'suffer from a single, FLSA-violating policy, and when proof of that policy or of conduct in con-

formity with that policy proves a violation as to all the plaintiffs.' " *Bouaphakeo v. Tyson Foods, Inc.*, 765 F.3d 791, 796 (8th Cir.2014) (quoting *O'Brien v. Ed Donnelly Enters., Inc.*, 575 F.3d 567, 585 (6th Cir. 2009)). Even though Plaintiffs' burden at this final stage is more onerous than at the notice stage, there is no requirement that Plaintiffs be "identically situated." *See Fast v. Applebee's Int'l, Inc.*, 243 F.R.D. 360, 363 (W.D.Mo.2007). In deciding whether they are similarly situated, this Court considers: " '(1) disparate factual and employment settings of the individual plaintiffs; (2) the various defenses available to defendant which appear to be individual to each plaintiff; [and] (3) fairness and procedural considerations.' " *Bouaphakeo*, 765 F.3d at 796 (quoting *Thiessen v. Gen. Elec. Capital Corp.*, 267 F.3d 1095, 1103 (10th Cir.2001)).

■ Importantly, the Court should evaluate these factors in light of "the fundamental purpose[s] of 29 U.S.C. § 216(b) ... to lower costs to the plaintiffs through the pooling of resources and ... to limit the controversy to one proceeding which efficiently resolves common issues of law and fact that arose from the same alleged activity." *Kautsch v. Premier Commc'ns*, No. 06–cv–04035–NKL, 2008 WL 294271, at *2 (W.D.Mo. Jan. 31, 2008) (internal quotation omitted); *see also Hoffmann–La Roche Inc. v. Sperling*, 493 U.S. 165, 170, 110 S.Ct. 482, 107 L.Ed.2d 480 (1989) (explaining that § 216(b) grants the court "the requisite procedural authority to manage the process of joining multiple parties in a manner that is orderly, sensible, and not otherwise contrary to statutory commands or the provisions of the Federal Rules of Civil Procedure."). Additionally, the Court should be mindful that the FLSA "is a remedial statute that has been construed liberally to apply to the furthest reaches consistent with congressional direction." *See Kelley v. Alamo*, 964 F.2d 747, 749–50 (8th Cir.1992) (internal citation

and quotation marks omitted). A district court's decertification decision will not be disturbed absent an abuse of discretion. *Bouaphakeo*, 765 F.3d at 796. In other words, the district court's decision will stand, so long as the court did not apply an incorrect legal standard, make clearly erroneous findings of fact, or misapply law to fact. *See Zavala v. Wal–Mart Stores, Inc.*, 691 F.3d 527, 534 (3d Cir.2012).

### B. *Analysis*

■ At issue here is whether the CRS position has been properly classified as "administrative" and, therefore, exempt from overtime pay under the FLSA. *See* 29 U.S.C. § 213(a)(1) (setting out the categories of employees exempt from overtime pay). Although the Court does not determine the merits of the Plaintiffs' case at this stage, it is useful for the Court to consider the "salient factors in an exemption analysis" to determine whether members of the class are similarly situated. *See Pendlebury v. Starbucks Coffee Co.*, 518 F.Supp.2d 1345, 1349 (S.D.Fla.2007). The federal administrative exemption applies to any employee who is

(1) Compensated on a salary or fee basis at a rate of not less than $455 per week … exclusive of board, lodging or other facilities;

(2) Whose primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers; and

(3) Whose primary duty includes the exercise of discretion and independent judgment with respect to matters of significance.

29 C.F.R. § 541.200(a)(1)–(3).

■ Southerncare argues that the collective class should be decertified because "the class members are not 'similarly situated' for purposes of an FLSA action." Clerk's No. 64–1 at 10. In support of its argument, Southerncare posits that the Plaintiffs work in different geographic locations across the United States and have "significant differences in the amount of discretion and independent judgment" each utilizes as part of their position. *Id.* at 11. Southerncare further argues that because the Plaintiffs are so few in number, "there is minimal efficiency in treating these claims in one case." *Id.* at 13. For the reasons that follow, the Court is not persuaded by Defendant's arguments. Plaintiffs have provided sufficient evidence for the Court to conclude that they are similarly situated and, therefore, that their misclassification claims are suitable for collective adjudication.

#### 1. *Factual and employment settings of the Plaintiffs.*

The first consideration in the similarly situated analysis requires the Court to examine the factual and employment settings of the individual Plaintiffs. *See Bouaphakeo*, 765 F.3d at 796. The parties' arguments under this factor revolve mainly around two topics: (1) the physical employment setting of each Plaintiff; and (2) the job duties actually performed by each Plaintiff. *See* Clerk's Nos. 64–1, 66.

##### a. *Physical employment settings.*

Southerncare argues that the class should be decertified because the Plaintiffs each work in different states and have different Community Relations Directors ("CRDs") to whom they report. Clerk's No. 64–1 at 11. Southerncare cites *Reed v. County of Orange*, 266 F.R.D. 446 (C.D.Cal.2010) in support of its argument.[2]

---

**2.** Southerncare also cites *Vargas v. Richard-*

*son Trident Co.*, No. H–09–1674, 2010 WL

*Reed* concluded that "[d]ecertification is appropriate where plaintiffs are subject to varying work conditions in different work locations or under different supervisors," but the facts of *Reed* are readily distinguishable from this case. *Id.* at 450. In *Reed*, the court granted decertification of a class including all of the sheriffs' deputies employed by the Orange County Sheriff's Department. *Id.* at 447. Although the court considered the fact that the plaintiffs worked at over 100 potential locations, its decision to decertify was more heavily based on the deputies' starkly differing job duties. *See id.* at 451 (explaining that some deputies were assigned to work directly with inmates at a jail while others worked in "office-style cubicles"). The court concluded that "[t]he wide variation in Plaintiffs' job duties and assignments is indicative of the fact that Plaintiffs' ... claims are not suited for collective action treatment." *Id.* at 452–53. Thus, *Reed* does not stand for the proposition that a class of plaintiffs who work in different locations under different supervisors cannot be certified.

Indeed, Plaintiffs have identified several cases where the opposite is true. *See Hipp v. Liberty Nat'l Life Ins. Co.*, 252 F.3d 1208, 1219 (11th Cir.2001) (concluding that the geographic location of the plaintiffs was not a conclusive factor in the similarly situated analysis); *In re Tyson Foods, Inc.*, 694 F.Supp.2d 1372, 1379 (M.D.Georgia 2010) (denying motion to decertify a class where plaintiffs worked in different poultry plants under different supervisors); *Burch v. Qwest Commc'ns Int'l, Inc.*, 677 F.Supp.2d 1101, 1117 (D.Minn.2009) (denying motion to decertify a class in part where plaintiffs worked at call centers nationwide under "hundreds of

different managers"). Accordingly, the Court is not persuaded that the various work locations and differing supervisors of Plaintiffs compel decertification in this case.

### b. *Job duties.*

Southerncare acknowledges that there is an identical company-wide job description for the CRS position. *See* Clerk's Nos. 64–1 at 11, 10–2 at 10. At the time the CRS position was created, Southerncare determined that all employees with that title would be exempt from the overtime provisions of the FSLA "based on the duties and responsibilities of the position." Clerk's No. 66–1 at 25. Nonetheless, Southerncare argues that the class should be decertified because the amount of discretion and independent judgment exercised by each Plaintiff—a critical element for classifying an employee as administrative and therefore exempt from overtime pay—varied significantly. Clerk's No. 64–1 at 11; *see* 29 C.F.R. § 541.200(a)(1)–(3). Plaintiffs, on the other hand, argue that because Southerncare classifies all CRSs as exempt without individual inquiry into the employees' actual job duties, an inquiry into the specific duties of each Plaintiff is not necessary here. Clerk's No. 66 at 9.

Plaintiff correctly argues that many courts have been heavily persuaded by an employer's decision to classify an entire category of employees as exempt. *See, e.g., Nerland v. Caribou Coffee Co., Inc.*, 564 F.Supp.2d 1010, 1024 (D.Minn.2007) (stating that "[t]he Court finds it disingenuous for Caribou, on one hand, to collectively and generally decide that all store managers are exempt from overtime compensation without any individualized inquiry, while on the other hand, claiming the

730155 (S.D.Texas Feb. 22, 2010), which is inapposite to its position. *Vargas* approved conditional certification in a similar FLSA overtime case, noting that "geographic loca-

tion is not relevant; a common policy, plan, or practice demonstrates a similar factual setting for purposes of showing workers are similarly situated." 2010 WL 730155 at *10.

plaintiffs cannot proceed collectively to challenge the exemption."). But other courts have cautioned that a blanket exemption for a particular group of employees "does not eliminate the need to make a factual determination as to whether class members are actually performing similar duties." *In re Wells Fargo Home Mortg. Overtime Pay Litig.*, 571 F.3d 953, 959 (9th Cir.2009) (internal quotation omitted); *see also Pendlebury*, 518 F.Supp.2d at 1353 (stating that "merely classifying a group of employees as exempt does not automatically qualify them as similarly situated"). Therefore, the · Court has reviewed the evidence regarding Plaintiffs' job duties in great detail to determine if they are similarly situated.

The "[m]ajor [j]ob [f]unctions" of a CRS include, among other things, "[w]orking with clinicians [to] develop and implement a comprehensive marketing plan for" various medical personnel and community organizations. Clerk's No. 10–2 at 10. The CRSs make visits to doctor's offices, nursing homes, and other locations in order to generate referrals to Southerncare hospice centers. Clerk's No. 11–1 at 3–4. According to Southerncare's job description, each CRS also "[a]ssumes other duties as developed and/or assigned by the Community Relations Director[,][c]ompletes the admissions process[,] . . . [p]articipates in on-call rotation during development[, and] [c]ompletes at minimum 250 professional contacts per month." *Id.* Plaintiffs' own descriptions of their job duties largely mirror Southerncare's job description for the CRS position.

Plaintiff Judkins was employed as a CRS in the Des Moines area. Clerk's No. 11–1 at 8. She testified that she was given a territory and a guideline to go certain places on certain days. Clerk's No. 15 at 5. Her CRD would give her a specific list of places to visit, such as assisted living centers and nursing homes. *Id.* at 6. She

testified that she had "freedom . . . on how [she] verbalized, talked to people." *Id.* at 5. Judkins worked "[w]henever they needed me" and was on call every other weekend. Clerk's No. 11–1 at 12. When she went to different facilities she would take brochures about Southerncare and sometimes create a "lunch and learn" situation. *Id.* at 13. She had a weekly meeting with her CRD to discuss what types of "awareness devices" to use in marketing Southerncare. *Id.*

Opt-in Plaintiff Miller was a CRS in Lenexa, Missouri. Clerk's No. 64–2 at 10–11. When she was hired, she was told that her hours would be Monday through Friday from eight to five, and that she would receive compensation time for any hours worked in excess of forty. *Id.* Miller testified that she worked on weekends on more than one occasion at the direction of her CRD. *Id.* at 13. She stated that her Southerncare time sheets were not accurate, but that she kept track of her overtime hours in a personal notebook. *Id.* at 7, 16. Miller testified that "at the beginning" her CRD would travel to places with her and show her what to do, such as hosting ice cream socials. *Id.* at 18–19. Her CRD taught her how to market Southerncare based on the various facilities they visited. *Id.* at 22–23. Later, Miller would mostly decide herself what places to visit, with occasional input from her CRD. *Id.* at 19. She visited doctor's offices, hospitals, skilled nursing facilities, and assisted living facilities. *Id.* at 21. Miller met with her CRD once or twice a week. *Id.*

Opt-in Plaintiff Waggle was employed as a CRS in Ohio. Clerk's No. 64–2 at 41. He was responsible for developing a list of accounts, making contact with those accounts, and providing them with information about Southerncare. *Id.* at 42–43. Waggle testified that "95% of everything I

did, I did on my own," but later stated that he developed his list of accounts "[w]ith some direction from the CRD" in accordance with the territory business plan. *Id.* at 43, 52. Waggle rarely met with his CRD in person, but did speak with her by phone, email, or text every day. *Id.* at 43, 46. His CRD would occasionally approve Waggle's driving routes to make sure they were satisfactory. *Id.* at 50. Waggle visited facilities and talked to nurses, staff people, and administrators about Southerncare and occasionally held "lunch and learns." *Id.* at 45. He acquired different marketing strategies from other CRSs at Southerncare training conferences. *Id.* Waggle accurately recorded the number of hours he worked. *Id.* at 48. According to Waggle, if he recorded weekend hours he would be paid for the extra time, but it would be deducted out of his next paycheck. *Id.* at 49.

Opt-in Plaintiff Holborrow was employed as a CRS in St. Louis, Missouri. Clerk's No. 64–2 at 65. She testified that she was "asked to work the 8 to 5," but that she also worked evenings and weekends. *Id.* at 68. In addition to making contacts with referral sources, Holborrow would sometimes complete an admissions packet with potential clients at her CRD's request. *Id.* at 69–70. Holborrow tried to schedule a doctor's lunch at least once a week, and met regularly with her contacts to educate them about Southerncare's services. *Id.* at 70. She had "oversight by the [CRD] continually on the emphasis she felt was important as to community contacts." *Id.* at 71. Holborrow explained that it was a "give and take" with the CRD, where she would help educate the CRD about territory-specific organizations and the CRD would provide "oversight" to Holborrow about "how best and most effectively to spend the hours of the day." *Id.* at 74. Holborrow had a daily phone call with her CRD and an occasional in-person meeting. *Id.* at 73. She testified that her timesheets "should be accurate." *Id.* Holborrow also testified that she requested, but was denied, "comp time" when she worked over forty hours a week. *Id.* at 75.

Based on Plaintiffs' testimony, the Court is persuaded that their job duties were substantially similar.[3] There was no major variation in the job functions performed by each Plaintiff—they each testified that they were assigned a territory and visited contacts within that territory to market Southerncare's hospice services. Southerncare's argument that Plaintiffs had widely varying levels of discretion and independent judgment is not fully supported by Plaintiffs' deposition testimony. Although it is true that some Plaintiffs had more discretion in choosing the locations they visited each day, each testified that they had at least some oversight or input from their CRD about where to spend their time.

In addition, each Plaintiff claimed that Southerncare violated the FLSA in the same way—by requiring them to work evening and/or weekend hours without overtime pay or compensation time. Southerncare argues that the Plaintiffs were told different things about overtime, worked different amounts of overtime, and differed in their timekeeping practices. But minor differences between

---

**3.** The Court notes that because opt-in Plaintiff Opperman had his deposition after the parties submitted briefs on this motion, the Court does not have information regarding Opperman's job duties. However, the Court concludes that the information provided by the other opt-in Plaintiffs provides more than enough evidence for the Court to decide the Motion. *See Scott v. Chipotle Mexican Grill, Inc.,* 300 F.R.D. 188, 192 (S.D.N.Y.2014) (explaining that "representative sampling" is an appropriate discovery method in FLSA collective actions).

Plaintiffs' experiences, even with regard to an essential element of their case, does not foreclose the possibility of collective adjudication. *See O'Brien,* 575 F.3d at 585 (concluding that plaintiffs were similarly situated where "their claims were unified by common theories of defendants' statutory violations, even if the proofs of these theories [were] inevitably individualized and distinct").

Southerncare compares this case to *Morano v. Intercontinental Capital Group, Inc.,* No. 10–cv–02192, 2012 WL 2952893 (S.D.N.Y. Jul. 17, 2012). There, the district court granted a motion to decertify the class, concluding that the plaintiffs had not shown a "systemically-applied company policy or practice," in part because they had "disparate timekeeping practices." *Id.* at *5, *9. Southerncare points out that here, Plaintiffs also had differing testimony regarding how they tracked their hours and whether their timekeeping was accurate. *See* Clerk's No. 68 at 2. However, the plaintiffs in *Morano* had other major differences that are not present in this case—some of the plaintiffs had signed contracts requiring them to get overtime hours approved, and the plaintiffs' pay was calculated in different ways.[4] *Id.* at *7–8. Plaintiffs are only required to prove that they are similarly situated—not identical in all respects. *See Nerland,* 564 F.Supp.2d at 1018. Here, not only did Southerncare apply a blanket overtime exemption and an identical job description to every CRS, but the Plaintiffs' actual job duties were similar as well. Although there are differences among Plaintiffs, the Court concludes that, overall, they are similarly situated.

### 2. *Individualized defenses.*

Next, the Court must consider whether the defenses available to Defendant are individual to each Plaintiff. *Bouaphakeo,* 765 F.3d at 796. Southerncare argues that because some Plaintiffs accurately recorded their timesheets while others did not, the various defenses available to Southerncare would be individual to each Plaintiff, rendering a collective action "highly inefficient." Clerk's No. 64–1 at 12 n. 3. Plaintiffs counter that Southerncare's argument is focused not on the question of liability, but solely on damages, which does not foreclose certification. Clerk's No. 66 at 15.

Plaintiffs are correct that "damages issues do not preclude the collective adjudication of the exemption issue." *Nerland,* 564 F.Supp.2d at 1025. And Southerncare does not specifically identify what individual defenses it would assert based on differences between individual Plaintiffs. In addition, it cannot be ignored that only five Plaintiffs remain in this case, minimizing any inefficiencies that may exist by having to determine individualized damages for each class member. Therefore, this factor weighs against decertification of the FLSA class.

### 3. *Fairness and procedural considerations.*

Finally, the Court considers issues of fairness and procedural efficiency. *See Bouaphakeo,* 765 F.3d at 796. Southerncare argues that because Plaintiffs are so few in number, and because the issues would require individualized testimony, "there is minimal efficiency in treating

---

**4.** Southerncare also cites *Marlo v. United Parcel Service, Inc.,* 251 F.R.D. 476 (C.D.Cal. 2008), to support its motion, but that case involved class certification under Federal Rule of Civil Procedure 23, which is based on a more exacting standard than class certifica-tion under the FLSA. *See O'Brien,* 575 F.3d at 584 (explaining that "[w]hile Congress could have imported the more stringent criteria for class certification under Fed.R.Civ.P. 23, it has not done so in the FLSA").

these claims in one case." The Court disagrees. Although determining if an exemption applies may be "an inherently fact-based inquiry," that alone "does not preclude a collective action where plaintiffs share common job traits." *Morgan v. Family Dollar Stores, Inc.*, 551 F.3d 1233, 1263 (11th Cir.2008). Plaintiffs have demonstrated that they have common job traits. Although there may be a need for individual testimony, the relatively small number of Plaintiffs mitigates any concern about procedural inefficiency. *See Cottle v. Falcon Holdings Mgmt., LLC*, 892 F.Supp.2d 1053, 1069 (N.D.Ind.2012) (concluding that individualized issues would not render a class of seven plaintiffs "unmanageable or undermine the objectives of proceeding collectively").

Further, the fact that Southerncare implemented a blanket overtime exemption for all CRSs weighs in Plaintiffs' favor under this prong of the analysis. *See Morgan*, 551 F.3d at 1264 ("There is nothing unfair about litigating a single corporate decision in a single collective action."). The Court is also mindful "that the FLSA is designed to be a remedial statute, and that it 'should be given a broad reading, in favor of coverage.'" *Nerland*, 564 F.Supp.2d at 1025 (quoting *Kelley*, 964 F.2d at 749–50). Accordingly, the Court concludes that the fairness and procedural considerations also weigh in favor of maintaining class certification.

## III. CONCLUSION

For the foregoing reasons, Defendant's Motion to Decertify (Clerk's No. 64) is DENIED.

IT IS SO ORDERED.